UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| **PATTY DUPRE ET AL** | **CASE NO. 6:20-CV-00756** |
| **VERSUS** | **JUDGE ROBERT R. SUMMERHAYS** |
| **PALFINGER MARINE USA INC ET AL** | **MAGISTRATE JUDGE CAROL B. WHITEHURST** |

**MEMORANDUM RULING**

Presently before the Court is a Motion for Summary Judgment [ECF No. 54] filed by Shell Oil Company ("Shell"). Plaintiffs and Palfinger Marine USA, Inc. have responded to the Motion. Shell's Motion raises two interrelated questions: does this case fall within the jurisdictional grant of the Outer Continental Shelf Lands Act ("OCSLA") and, if so, does OCSLA's choice-of-law provision bar Plaintiffs' claims against Shell under section 905(b) of the Longshore and Harbor Workers Compensation Act? As explained below, the Court answers both questions in the affirmative and, therefore, GRANTS Shell's Motion for Summary Judgment.

**I.**
**BACKGROUND**

Plaintiffs' claims arise from a June 30, 2019, accident (the "June 30th Accident") involving a lifeboat that fell from its moorings on a floating, tension leg oil and gas exploration and development platform—the Auger platform. The Auger platform is "located on and permanently attached to the Outer Continental Shelf ("OCS") at Garden Banks Block 426" in the Gulf of Mexico approximately 130 miles due south of Vermillion Parish.[1] The platform's location places

---

[1] Declaration of Jose A. Rincon at ¶ 2, attached as Exhibit A to ECF No. 54.

it within the "Louisiana Coastal Zone Management" area on the Bureau of Ocean Energy Management's ("BOEM") "OCS Plans Map for Coastal Zone Management Program."[2]

The June 30 Accident involved Lifeboat No. 6, which was one of ten lifeboats on the Auger platform.[3] The United States Coast Guard's safety regulations required these lifeboats on the platform.[4] Shell Offshore Inc. is the owner and operator of the Auger platform as well as Lifeboat No. 6.[5] On June 30, 2019, Shell Offshore Inc. was conducting a manned quarterly test launch of Lifeboat No. 6. During this test launch, Lifeboat No. 6 was lowered to the surface of the Gulf of Mexico using "davit fall cables" and electric wenches. The lifeboat was disconnected from the cables and operated by its four-person maintenance crew. When these test maneuvers were completed, Lifeboat No. 6 was reconnected to the Auger platform using the two davit fall cables; these cables were attached to hooks on the bow and stern of the lifeboat.[6] The lifeboat was then hoisted by a combination of electric winches and manual hoisting into its stowed position on the platform.[7] When the lifeboat reached the deck of the platform, the first member of the maintenance crew successfully stepped off the lifeboat onto the deck.[8] The second crew member was in the process of exiting the lifeboat to the Auger's deck when Lifeboat No. 6 fell from the platform to the surface of the Gulf of Mexico.[9] Two members of the maintenance crew died in the accident.[10]

---

[2] *Id*. at ¶¶ 5 and 6. The Auger platform's sole purpose is the exploration and production of minerals on the OCS and operates seventeen producing wells and associated production facilities. *Id.* at ¶ 7.
[3] *Id.* at ¶ 10.
[4] *Id*. at ¶ 11.
[5] *Id.* at ¶ 3. Shell points out that Shell Oil Company, the defendant named in the complaint, does not own, or operate the Auger platform or Lifeboat No. 6.
[6] *Id*. at ¶ 14.
[7] *Id*. at ¶ 12.
[8] *Id*. at ¶ 15.
[9] *Id*. at ¶¶ 15-16.
[10] *Id.* at ¶ 16.

One of the fatalities was Brandon Dupre, who was an employee of Shell Exploration & Production Company ("SEPCO") at the time of the June 30th Accident. Mr. Dupre was employed as a mechanic on the Auger platform, and his primary job duties included maintenance of the platform's oil and gas production facilities, such as the platform's "rotating equipment, utilities system, and emergency response systems."[11] The present case was commenced by Mr. Dupre's wife, Patty Dupre, who has asserted claims in her individual capacity as well as on behalf of Dylan Dupre, her minor child, and Gage Dupre (collectively, "Plaintiffs").[12] Plaintiffs assert claims against Shell Oil Company ("Shell") under the Harbor Workers Compensation Act ("HWCA"), 33 U.S.C. § 905(b).[13] Plaintiffs also assert claims against Palfinger Marine USA, Inc. ("Palfinger"), alleging that Palfinger was responsible for annually inspecting the ten lifeboats on the Auger platform.[14] Plaintiffs also allege that Palfinger is "the owner and/or manufacturer of the control release cables and/or the release handle to the hooks on the lifeboats."[15] Plaintiffs allege that the release cable, the handle to the hooks, and/or the cable system used to hoist Lifeboat No. 6 were defective.[16] The also allege that Shell was negligent in not maintaining and inspecting their hook and cable system.[17]

## II.
### SUMMARY JUDGMENT STANDARD

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought."[18] "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and

---

[11] *Id.* at ¶ 9.
[12] ECF No. 3 at 1.
[13] *Id.*
[14] ECF No. 1, ¶ 5.
[15] *Id.* at ¶ 6.
[16] *Id.*
[17] *Id.*
[18] Fed. R. Civ. P. 56(a).

3

the movant is entitled to judgment as a matter of law."[19] "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party."[20] As summarized by the Fifth Circuit:

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. However, where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial.[21]

When reviewing evidence in connection with a motion for summary judgment, "the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached."[22] "Credibility determinations are not part of the summary judgment analysis."[23] Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof."[24]

### III.
#### ANALYSIS

The sole claim against Shell is Plaintiffs' vessel negligence claim under the HCWA, 33 U.S.C. § 905(b). A Section 905(b) claim is "limited to maritime torts" and is only "cognizable in

---

[19] *Id.*
[20] *Quality Infusion Care, Inc. v. Health Care Service Corp.*, 628 F.3d 725, 728 (5th Cir. 2010).
[21] *Lindsey v. Sears Roebuck and Co.,* 16 F.3d 616, 618 (5th Cir.1994) (internal citations omitted).
[22] *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir.2001); *see also Feist v. Louisiana, Dept. of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (court must view all facts and evidence in the light most favorable to the non-moving party).
[23] *Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 458 (5th Cir. 2002).
[24] *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004) (alterations in original) (quoting *Celotex v. Catlett*, 477 U.S. 317, 322 (1986)).

admiralty;" accordingly, maritime law must apply for Plaintiffs to properly bring a section 905(b) action against Shell.[25] Maritime law does not apply—and, hence, a section 905(b) claim is not cognizable—if state law applies through OCSLA, 43 U.S.C. § 1331, et seq.[26] The Court first addresses whether OCSLA jurisdiction governs and, if so, whether maritime or state law applies through OCSLA.

### A. OCSLA Jurisdiction.

The relevant portion of OCSLA's jurisdictional grant provides:

> (b)(1) Except as provided in subsection (c) of this section, the district courts of the United States shall have jurisdiction of cases and controversies arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals ....[27]

OCSLA's jurisdictional grant is broad and covers "a wide range of activity occurring beyond the territorial waters of the states on the outer continental shelf of the United States."[28] The Fifth Circuit has adopted a "but-for" test to determine the applicability of OCSLA.[29] This "but-for" test consists of three factors (sometimes referred to as *Hufnagel* factors): (1) the facts underlying the complaint occurred on the proper situs; (2) the plaintiff's employment furthered mineral development on the OCS; and (3) the plaintiff's injury would not have occurred but for his employment.[30] The evidence in the summary judgment record establishes that the Auger platform is a covered OCSLA situs. Specifically, the Auger platform is a floating platform located on and

---

[25] *May v. Transworld Drilling Co.*, 786 F.2d 1261, 1264 (5th Cir. 1986) (quoting *Drake v. Raymark Indus., Inc.*, 772 F.2d 1007, 1012 (1st Cir. 1985)).
[26] *Id.*
[27] 43 U.S.C. § 1349(b)(1)(A).
[28] *Texaco Expl. & Prod., Inc. v. AmClyde Engineered Prod. Co.*, 448 F.3d 760, 769 (5th Cir.), amended on reh'g, 453 F.3d 652 (5th Cir. 2006).
[29] *See Hufnagel v. Omega Serv. Indus., Inc.,* 182 F.3d 340, 350 (5th Cir. 1999) ("We apply a broad 'but-for' test to determine whether a cause of action arises under OCSLA."); *Recar v. CNG Producing Co.*, 853 F.2d 367, 369 (5th Cir. 1988).
[30] *Hufnagel,* 182 F.3d at 350; *Barker v. Hercules Offshore, Inc.*, 713 F.3d 208, 213 (5th Cir. 2013).

permanently attached to the OCS at Garden Banks Block 426.[31] The platform has seventeen producing wells and associated production facilities and, therefore, it's the primary purpose is the exploration and production of minerals on the OCS.[32] Courts have held that offshore platforms whose purpose is the production of minerals on the OCS qualify as an OCSLA situs.[33]

Palfinger, however, argues that a genuine question of material fact exists as to whether the June 30th Accident that led to Dupre's death occurred on a OCSLA situs. Palfinger appears to base its argument on the fact that Dupre's death occurred when Lifeboat No. 6 fell from the Auger platform and hit the surface of the Gulf of Mexico; because the lifeboat ultimately fell into the Gulf, Palfinger suggests that the accident did not occur on an OCSLA situs.

Palfinger's argument is not consistent with the jurisprudence addressing the first *Hufnagel* factor, nor is it consistent with the summary judgment record. "Courts have held that when….an individual is 'physically connected' to an offshore platform at the time of the accident giving rise to the suit, the OCSLA situs requirement is satisfied."[34] Here, Lifeboat No. 6 was physically connected to the Auger platform by two metal davit fall cables immediately before the lifeboat dropped to the water.[35] Plaintiffs' complaint grounds their claims, in part, on the cables, securing hooks, and davits connecting Lifeboat No. 6 to the Auger platform. Specifically, they allege that the "cables, securing hooks, and davits, were defective in design and composition" … and that Shell was negligent "in failing to adequately inspect and/or replace the defective securing hooks,

---

[31] *See* 43 U.S.C. § 1333(a)(2)(A) (covering "artificial islands and fixed structures erected" on the OCS).
[32] *Id.* at ¶ 7.
[33] *See, e.g., AmClyde Engineered Prod. Co*., 448 F.3d at 771.
[34] *Landerman v. Tarpon Operating & Dev., L.L.C*., 19 F. Supp. 3d 678, 683 (E.D. La. 2014); *See also Henson v. Odyssea Vessels, Inc.*, 2007 WL 3343011, at *1 (E.D. La. Nov. 8, 2007) (OCSLA applied claims involving a plaintiff who, "in an effort to return to shore, was lowered in a personnel basket via crane onto the deck of a crew boat," and, "[i]n the process of being lowered…was 'violently slammed into the cluttered deck' of the waiting vessel"), modified, 2008 WL 544184 (E.D. La. Feb. 25, 2008); *Champagne v. Tetra Applied Techs. Inc.*, 2006 WL 287985, at *3 (S.D. Tex. Feb. 6, 2006).
[35] Exhibit A to ECF No. 54, at ¶ 14.

6

cables, and davits."[36] The fact that the failure of this cable and hook system resulted in the lifeboat ultimately landing in the Gulf does not create a genuine question of material fact as to the OCSLA situs requirement because the lifeboat was physically connected to the platform at the time of the accident and was being lifted toward its permanent berth on the Auger platform.[37] These facts establish the first *Hufnagel* factor for OCSLA jurisdiction.

As to the second factor, Mr. Dupre's employment furthered mineral development on the OCS. He was employed by SEPCO as a mechanic working on the Auger platform and his work supported the exploration and production of minerals on the OCS.[38] Palfinger does not contest this factor.

Finally, as to the third factor, Mr. Dupre's fatal injuries would not have occurred but for his employment on the Auger platform. Dupre's job duties including performing the quarterly test launch of Lifeboat No. 6 on June 30, 2019. The summary judgment record establishes that Lifeboat No. 6 and the other nine lifeboats on the Auger platform were safety equipment required by the United States Coast Guard for oil and gas operations conducted from the platform.[39] Palfinger also does not contest this factor.

In sum, all three *Hufnagel* factors for OCSLA jurisdiction are satisfied based on the undisputed facts.

---

[36] ECF No. 19 at ¶ 46.
[37] *See Alleman v. Omni Energy Servs. Corp.*, 580 F.3d 280, 286 (5th Cir. 2009) ("It does not impact our analysis that [the plaintiff] fell into the sea after the accident occurred on the platform."); *see also AmClyde*, 448 F.3d at 772.
[38] Exhibit A to ECF No. 54, at ¶¶ 8 and 9.
[39] *Id*. at ¶ 11.

### B. Does Maritime Law Apply of its Own Force?

Given that OCSLA jurisdiction applies, the Court must now address whether OCSLA requires the application of Louisiana state law as surrogate federal law. OCLSLA includes a choice-of-law provision:

> To the extent that they are applicable and not inconsistent with [Subchapter III of Title 43, United States Code, Chapter 29,] or with other Federal laws and regulations of the Secretary [of the Interior] now in effect or hereafter adopted, the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf, and the President shall determine and publish in the Federal Register such projected lines extending seaward and defining each such area.[40]

Under this provision, OCSLA "extends federal law to the Outer Continental Shelf and borrows adjacent state law as a gap-filler."[41] As explained by the Supreme Court, "[t]he purpose of the [OCSLA] was to define a body of law applicable to the seabed, the subsoil, and the fixed structures ... on the outer [sic] Continental Shelf."[42] According to the Supreme Court, "for federal law to oust adopted state law, federal law must first apply."[43] "Because OCSLA does not displace general maritime law, substantive maritime law continues to govern where both OCSLA and general maritime law could apply."[44] Based on *Rodrigue*, the Fifth Circuit articulated a three-part test to determine whether federal law ousts state law in an OCSLA case: "(1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil seabed, or artificial structures permanently or

---

[40] 43 U.S.C. § 1333(a)(2)(A).
[41] *AmClyde*, 448 F.3d at 772
[42] *Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 354, 89 S.Ct. 1835, 1836 (1969).
[43] *Id.*
[44] *Hufnagel*, 182 F.3d at 350.

8

temporarily attached thereto). (2) Federal maritime law must not apply of its own force. (3) The state law must not be inconsistent with Federal law."[45]

The first *Rodrigue/PTL* factor—that the controversy arose on a OCSLA situs—is satisfied here. As explained above, the lifeboat involved in the accident was attached to the Auger platform (an OCSLA situs) at the time of the accident. Plaintiffs' claims focus on defects in the design and composition of the hooks, cables, and devit connecting the lifeboat to the platform, as well as Shell's alleged negligence in maintaining equipment attached to the platform. The accident thus occurred on an OCSLA situs. The fact that the lifeboat fell from the platform and ultimately landed on the surface of the Gulf as a result of the alleged failure of this equipment does not change this analysis.

The second *Rodrigue/PTL factor*—whether federal maritime law applies of its own force—is more heavily disputed. Whether federal maritime law applies of its own force turns on whether the incident has "a potentially disruptive impact on maritime commerce," or "the general character" of the "activity giving rise to the incident" shows a "substantial relationship to traditional maritime activity."[46] Fifth Circuit precedent provides some guidance in addressing this factor in the present case. In *Texaco Expel. & Prod., Inc. v. AmClyde Engineered Prod. Co.*,[47] the court concluded that state law, not maritime law, applied to claims that arose from the installation of a support frame for an oil and gas platform. During the installation, a suspended deck module fell to the surface of the Gulf of Mexico when the wire rope line of a heavy-lift derrick barge failed.[48] The plaintiff in that case asserted tort claims for defective design and

---

[45] *Union Texas Petroleum Corp. v. PLT Engineering, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990).
[46] *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534, 115 S. Ct. 1043, 1048, 130 L. Ed. 2d 1024 (1995).
[47] 448 F.3d 760, 771 (5th Cir.), amended on reh'g, 453 F.3d 652 (5th Cir. 2006),
[48] *Id.* at 766.

construction, as well as various negligence claims. Comparing that incident to the incident at issue in *Grubert*—damage to an underwater structure—the Fifth Circuit concluded that the crane failure in *AmClyde* was not potentially disruptive to maritime commerce.[49] The court also concluded that, even though the deck was suspended at the time of the crane failure and the deck ultimately fell into the Gulf, the accident was not substantially related to traditional maritime activity.[50] Rather, the plaintiff's "claims [were] inextricably linked to the [operation] of a platform permanently fixed to the Shelf for the purposes of development and would not have arisen but for such development."[51]

    Here, even though the accident at issue involved a lifeboat that fell to the surface of the Gulf, the claims arising from that accident are inextricably linked to the operation of the Auger platform, and that platform was engaged in the development and production of minerals on the OCS. The summary judgment record shows that the lifeboat involved was required for the operation of the Auger platform by the Coast Guard's safety regulations. The accident occurred during a routine test of that safety equipment. The accident allegedly resulted when the hook, cable, and davit system on the platform failed. And, the lifeboat was connected to the platform, and was being moved to its permanent berth on the platform when it fell to the surface of the Gulf. Like *AmClyde*, the Court concludes that the claims in the present case are inextricably linked to the development of minerals on the OCS, and not traditional maritime activity

---

[49] *Id.*
[50] *Id.*
[51] *Id.* at 744. Citing *Rodrigue*, 395 U.S. at 361, the court noted that "[t]he distinctive text and legislative history of OCSLA weigh against the application of admiralty law to claims arising out of accidental death of shelf workers on platforms." *Id.* at 773.

Palfinger points to two lower court decisions—*Bonnette v. Shell Offshore, Inc.*[52] and *Nottingham v. Murphy Oil USA, Inc.*[53]—to support its argument that maritime law applies to this case because the accident involved a lifeboat that landed on the surface of the Gulf. The *Bonnette* decision involved a similar incident in which a rescue pod on an OCS platform fell to the surface of the Gulf during a safety drill.[54] The court concluded that the accident involved traditional maritime activity and that maritime law, not state law, applied.[55] The court first observed that "the execution of lifeboat and man-overboard drills are an essential part of maritime activity."[56] The fact that lifeboat drills are also conducted in connection with an OCS platform was irrelevant to the *Bonnette* court because the "reasons for escape capsules aboard a fixed platform are identical to those for having lifeboats aboard ships… [t]heir function in an emergency is identical…."[57] The court then concluded "the line between OCSLA and maritime jurisdiction should be drawn at the point at which the platform workers take on the role of operators of escape capsules."[58]

The *Bonnette* court's analysis is not persuasive for at least two reasons. First, its analysis is inconsistent with *AmClyde* and *Rodrigue.* Both *AmClyde* and *Rodrigue* looked to the connection between the activities that gave rise to the plaintiff's claims and the production and development of minerals on the OCS.[59] The *Bonnette* court, in contrast, categorically concludes that any activity related to lifeboats or lifeboat safety drills is inherently maritime in character regardless of whether those activities are required for the operation of an OCS platform. The *Bonnette* court grounds its analysis on cases involving the use of lifeboats and safety drills *in connection with vessels engaged*

---

[52] 838 Supp. 1175 (S.D. Tex. 1993).
[53] 2009 WL 50160 (E.D. La. 2009).
[54] 838 F.Supp. at 1177-79.
[55] *Id*. at 1185-86.
[56] *Id*. at 1185.
[57] *Id.*
[58] *Id.*
[59] *AmClyde*, 448 F.3d at 774-76.

11

*in maritime commerce*.[60] In those vessel cases, the use of lifeboats and safety drills is, arguably, inextricably connected to a traditional maritime activity because they aided (and were likely required for) the vessels' operations in maritime commerce. In contrast, the lifeboats at issue in *Bonnette* and the present case were not used in connection with traditional maritime activities but were instead safety equipment required for the operation of an OCS platform. Accordingly, the *Bonnette* court's analysis is inconsistent with *AmClyde* and *Rodrigue* because its categorical rule ignores the distinction between the use of lifeboats and safety drills in connection with traditional maritime activity and their use as safety equipment required for OCS development and production activities. As noted by the Fifth Circuit in *AmClyde*, "exploration and development of the Continental Shelf are not themselves maritime commerce." [61]

*Bonnette* is also unpersuasive because it bases its analysis on the four-part "maritime connection" test found in *Kelly v. Smith*,[62] which was abrogated by the Supreme Court in *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co*.[63] Moreover *Nottingham*, which was decided after *Grubart*, merely followed *Bonnette* without addressing whether *Bonnette* is still valid after *Grubart* and without considering the connection between the accident in that case and the operation of an OCS platform. Neither *Bonnette* nor *Nottingham* alter the Court's conclusion that maritime law does not apply "of its own force" in the present case.

Finally, the parties' arguments and the summary judgment record does not show that Louisiana state law conflicts with federal law. In sum, federal maritime law does not oust Louisiana state law as surrogate federal law with respect to this case. Because section 905(b) is

---

[60] *Bonnette*, 838 F.Supp. at 1185.
[61] 448 F.3d at 774-75 (quoting *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 425, 105 S.Ct. 1421 (1985)).
[62] 485 F.2d 520 (5th Cir. 1973).
[63] 513 U.S. 527 (1995).

"limited to maritime torts" and is "only cognizable in admiralty," Plaintiffs' section 905(b) claims against Shell must be dismissed.[64]

## IV.
### CONCLUSION

Based upon the foregoing reasons, the Court GRANTS Shell's Motion for Summary Judgment [ECF No. 54]. Plaintiffs' 905(b) claims against Shell are dismissed with prejudice.

THUS DONE in Chambers on this 23rd day of March, 2022.

ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE

---

[64] *May*, 786 F.2d at 1264. Given the Court's ruling in this regard, the Court need not address Shell's alternative argument based on the identity of the owner/operator of the lifeboat.