UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

JEREMY EARNEST       *    CIVIL ACTION NO.
              *    6:20-cv-00685
              *
VERSUS          *
              *
PALFINGER MARINE USA, INC.   *
*********************************************************************************

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**
**<u>SHELL OFFSHORE, INC.'S  MOTION FOR SUMMARY JUDGMENT</u>**


Respectfully submitted,

ARNOLD & ITKIN LLP

_____
Noah M. Wexler
LA Bar Roll No. 34995
Ben Bireley
LA Bar Roll No. 37587
835 Louisiana Avenue
Baton Rouge, LA 70802
225-412-6348 (Telephone)
jaiteam@arnolditkin.com
e-service@arnolditkin.com
nwexler@arnolditkin.com
bbireley@arnolditkin.com

*Counsel for Plaintiff*

1

## TABLE OF CONTENTS

Table of Contents ............................................................................................. 2

Table of Authorities ....................................................................................... 4

       INTRODUCTION.......................................................................................... 7

EVIDENCE........................................................................................................ 9

FACTUAL BACKGROUND ............................................................................ 10

    A.    Shell Offshore's Duties As The Auger's Owner/Operator ............................ 11

    B.    Shell Offshore's Agreement With SEPCO ...................................... 11

    C.    Shell Offshore's Agreement With Palfinger ...................................... 12

    D.    Shell Offshore Knew Or Should Have Known About The Corroded Cable .. 13

    E.    The Corroded Cable Causes Mr. Earnest's Injuries........................................ 15

    F.    The Summary Judgment Motion ................................................... 16

THE COURT SHOULD DENY SHELL OFFSHORE'S MOTION............................................. 17

    A.    Shell Offshore Is Liable Under Section 905(b) in its Capacity as a Vessel Owner
        18

    B.    Shell Is Liable Under Article 2322 ................................................ 20

        1.    Shell Offshore had actual knowledge via its authorized agent, SEPCO. ..... 22

        2.    Shell Offshore would have known about the defective cable if it exercised
            reasonable care. ........................................................... 23

C.    Shell Offshore Is Liable Under Article 2317 and 2317.1. ............................ 24

D.    Mr. Earnest And His SEPCO Coworkers Were Not Borrowed Servants ....... 26

E.    The Court Should Reconsider its prior Ruling on Mr. Earnest's Claims under LHWCA 905(b). ............................................................................................ 29

CONCLUSION ......................................................................................................... 30

## TABLE OF AUTHORITIES

Page(s)

Cases

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..........................................................................................17

*Bell v. Demax Mgt. Inc.*,
   824 So. 2d 490 (La. App. 4th Cir. 2002)..........................................................22

*Blanchard v. Ogima*,
   215 So. 2d 902 (La. 1968)................................................................................28

*Broussard v. State ex rel. Office of State Bldgs.*,
   113 So.3d 175 (La.2013).............................................................................20, 21

*Burmaster v. Plaquemines Parish Gov't*,
   982 So. 2d 795 (La. 2008)................................................................................21

*Callahan v. Gulf Logistics, LLC*, 6:06 CV 0561,
   2009 WL 891888 (W.D. La. Mar. 31, 2009).....................................................18

*Castille v. Apache Deepwater LLC*,
   2017 WL 2814068 (W.D. La. June 27, 2017) ...................................................26

*Coleman v. Houston Indep. Sch. Dist.*,
   113 F.3d 528 (5th Cir.1997).............................................................................17

*Cook v. John Hancock Life Ins. Co. (U.S.A)*, 7:12-CV-00455,
   2015 WL 178108 (W.D. Va. Jan. 14, 2015) .....................................................29

*Dawson v. Rocktenn Services, Inc.*,
   674 Fed. Appx. 335 (5th Cir. 2016) .................................................................24

*Diamond Offshore Co. v. A&B Builders, Inc.*,
   75 F. Supp. 2d 676 (S.D. Tex. 1999) ...........................................................19, 21

*Doughty v. Insured Lloyds Ins. Co.*,
   576 So. 2d 461 (La. 1991).................................................................................25

*Dupree v. City of New Orleans*,
   765 So. 2d 1002 (La. 2000)...............................................................................25

*Engstrom v. First Nat'l Bank of Eagle Lake*,
   47 F.3d 1459 (5th Cir.1995)..............................................................................18

*Foster v. Destin Trading Corp.*,
   700 So. 2d 199 (La. 1997).................................................................................17

*Fulltime Restoration Inc. v. State Farm Fire & Cas. Co.*, 2:21-CV-01981,
   2022 WL 90179 (W.D. La. Jan. 7, 2022) .........................................................23

*Giorgio v. All. Operating Corp.*,
   921 So. 2d 58 (La. 2006)..................................................................................25

*Hudson v. Schlumberger Tech. Corp.*,
   452 Fed. Appx. 528 (5th Cir. 2011) ..................................................................18

*In re Hellenic Inc.*,
   252 F.3d 391 (5th Cir. 2001).............................................................................22

*Int'l Shortstop, Inc. v. Rally's, Inc.,*
  939 F.2d 1257 (5th Cir. 1991)...................................................................................22

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,*
  513 U.S. 527, 115 S. Ct. 1043, 130 L. Ed. 2d 1024 (1995) ...................................29

*Jorge-Chavelas v. Louisiana Farm Bureau Cas. Ins. Co.,*
  307 F. Supp. 3d 535 (M.D. La. 2018)......................................................................27

*Krueger v. La Quinta Inn & Suites,*
  2018-0052 (La. App. 1 Cir. 9/21/18) (La. App. 1st Cir. Sept. 21, 2018) ..................21

*LeBlanc v. City of Abbeville,*
  *259 So. 3d 372 (La. App. 3d Cir. 2018)* ...................................................................23

*Levene v. Pintail Enterprises, Inc.,*
  943 F.2d 528 (5th Cir. 1991)............................................................................18, 19

*Lozman v. City of Riviera Beach, Fla.,*
  568 U.S. 115 (2013) .................................................................................................19

*Mays v. Dir., Off. of Workers' Comp. Programs,*
  938 F.3d 637 (5th Cir. 2019)....................................................................................27

*McLaurin v. Noble Drilling (US) Inc.,*
  529 F.3d 285 (5th Cir. 2008)....................................................................................19

*Moczygemba v. Danos & Curole Marine Contractors, Inc.,*
  561 F.2d 1149 (5th Cir. 1977)..................................................................................21

*Olsen v. Shell Oil Co.,*
  365 So.2d 1285, 1289-91 (La. 1978...................................................................22, 25

*Parta v. Grand Isle Shipyard, Inc.,*
  2008 WL 5262728 (W.D.La.12/17/2008)..................................................................18

*Pimental v. LTD Canadian Pac. Bul,*
  965 F.2d 13 (5th Cir.1992)........................................................................................18

*Poth v. Small, Craig & Werkenthin, L.L.P.,*
  967 S.W.2d 511 (Tex. App.–Austin 1998, pet. denied) ...........................................22

*Prince v. Rouse's Enterprises, L.L.C.,*
  305 So. 3d 1078 (La. App. 5th Cir. 2020)................................................................21

*Raymo v. Cargill Inc.,*
  2014 WL 545872 (W.D. La. Feb. 7, 2014)...............................................................26

*Reed v. Wal-Mart Stores, Inc.,*
  708 So. 2d 362 (La. 1998).......................................................................................21

*Robinson v. Orient Marine Co.,*
  505 F.3d 364 (5th Cir. 2007)..............................................................................19, 20

*Sharp v. City of Houston,*
  164 F.3d 923 (5th Cir. 1999)....................................................................................22

*Singleton v. Fieldwood Energy, LLC,*
  2016 WL 3902599 (E.D. La. July 19, 2016) .............................................................26

*Stewart vs. Dutra Const. Co.,*
  543 U.S. 481 (2005) .................................................................................................20

*Strong v. B.P. Expl. & Prod., Inc.,*
  440 F.3d 665 (5th Cir. 2006).................................................................................8, 31

5

*Thibodeaux v. Allstate Ins. Co.*,
   297 So. 3d 762 (La. 2020)....................................................................................24
*Truxillo v. Louisiana Stadium and Exposition Dist.*,
   172 So. 3d 79 (La. App. 4th Cir. 2015).............................................................26
*Vincent v. Fieldwood Energy, L.L.C.*,
   2015 WL 6758269 (E.D. La. Nov. 5, 2015) ................................................28, 29

Statutes

1 U.S.C. § 3...............................................................................................................20
33 U.S.C. § 901..........................................................................................................7
33 U.S.C. § 905(b) ...............................................................................................19, 20
La. Civ. Code art. 2317.1......................................................................................9, 26
La. Civ. Code art. 2322 .....................................................................................Passim
La. Civ. Code art. 2317 ................................................................................9, 17, 26
La. Civ. Code art. 466..............................................................................................22

**Rules**

Fed. R. Civ. P. 56(c)..................................................................................................18

**Regulations**

33 C.F.R. § 142.4(a), (b)......................................................................................11, 24
46 C.F.R. § 109.301.......................................................................................11, 12, 25

**Other Authorities**

Restatement (Third) Of Agency § 5.03 (2006)...........................................................23

# I
## INTRODUCTION

Jeremy Earnest suffered catastrophic injuries aboard the Auger TLP ("Auger") platform's Lifeboat 6 when it fell 80 feet to the ocean surface after a defective hook-release cable failed. He has asserted claims against the Auger's owner, Shell Offshore, Inc., under section 905(b) of the Longshoremen and Harbor Worker's Compensation Act ("LHWCA"), 33 U.S.C. § 901 *et seq.*, and, alternatively, Louisiana common law. Shell Offshore, relying on this Court's prior ruling, made in relation to a distinct Shell entity, that Louisiana law—not maritime law—governs Mr. Earnest's claims, has now moved for summary judgment. It contends that Mr. Earnest cannot make a claim under article 2322 or article 2317.1 of the Louisiana Civil Code because Shell Offshore had no "payroll employees" on the Auger and thus did not have actual or constructive knowledge of the defective cable.  Shell Offshore further contends, in the alternative, that Mr. Earnest was its borrowed servant.

Shell Offshore's motion fails for four reasons. *First*, Mr. Earnest respectfully submits that section 905(b) of the LHWCA and general maritime law govern. This case involves a defective vessel on navigable water and personal injury to one of its operators. The Fifth Circuit has long recognized that personal injuries associated with vessels (including life vessels) are governed by maritime law—even when the vessel is used to support oil and gas exploration on the Outer Continental Shelf ("OCS"). *See, e.g., Strong v. B.P. Expl. & Prod., Inc.*, 440 F.3d 665, 669 (5th Cir. 2006). As such, the Court should deny Shell Offshore's motion because Shell Offshore breached its section 905(b) duties by failing to remedy the defective cable.

*Second*—and even assuming that Louisiana law applies—Shell Offshore is the "*owner and operator* of Auger as well as Lifeboat No. 6" by its own admission. Dkt. 89-4 at 2.[1] As such, it is "answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it . . . upon a showing [it] knew or, in the exercise of reasonable care, should have known of the vice or defect which caused the damage." LA. CIV. CODE art. 2322. Shell Offshore concedes that Mr. Earnest's injuries were "occasioned by [the Auger's] ruin," namely the defective hook-release cable. And Shell Offshore "knew or, in the exercise of reasonable care, should have known" of this defect because: (i) it had knowledge through its agent, Shell Exploration & Production Company ("SEPCO"), of the defective condition; and (ii) the defective hook-release cable would have been discovered with reasonable care by Shell Offshore. A reasonable jury could thus find Shell Offshore liable to Mr. Earnest under article 2322.

*Third*, Shell is also liable for its "things" under articles 2317 and 2317.1 for the same reasons it is liable for its platform under article 2322. Article 2317.1 provides that "[t]he owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage. . . ." LA. CIV. CODE art. 2317.1.

*Fourth*, Shell Offshore does not (and cannot) demonstrate that Mr. Earnest—or any SEPCO employee—was its borrowed servant as a matter of law. To do so, Shell Offshore must show that the nine (9) factors from the Fifth Circuit's decision in *Ruiz v. Shell Oil Company* support such a finding. 413 F.2d 310 (5th Cir. 1969). But it cannot do so here because it contends it had no "payroll employees" on Auger. It thus has no evidence that it controlled Mr. Earnest or any SEPCO

---

[1] All emphasis herein is added unless stated otherwise.

employee's work at any point in time, furnished Mr. Earnest or any SEPCO employee tools, paid

Mr. Earnest or any SEPCO employee, or could discharge Mr. Earnest or any SEPCO employee.

Shell also cannot show an agreement with SEPCO, acquiescence, or purported employment by Mr.

Earnest for any considerable length of time.

Accordingly, the evidence precludes summary disposition of Mr. Earnest's claims, regardless

of whether general maritime law or Louisiana law applies. The Court should thus deny Shell

Offshore's motion.

## II.
### EVIDENCE

**Exhibit 1:**      Jason Kemp Deposition Transcript

**Exhibit 2:**      Daniel Bolton Deposition Transcript

**Exhibit 3:**      Matt Favaloro Deposition Transcript

**Exhibit 4:**      Jacob Lanier Deposition Transcript

**Exhibit 5:**      Kelly Perkins Deposition Transcript

**Exhibit 6:**      Jason Pittman Deposition Transcript

**Exhibit 7:**      Tio Devaney Deposition Transcript

**Exhibit 8:**      Charles Debenport Deposition Transcript

**Exhibit 9:**      Jeremy Earnest Deposition Transcript

**Exhibit 10:**      McSwain Engineering Expert Report

**Exhibit 11:**      John C. Pierce Expert Report

**Exhibit 12:**      Shell's Auger Lifeboat Incident Report

**Exhibit 13:**      Jeremy Earnest Statement

**Exhibit 14:**      Palfinger Service Agreement

**Exhibit 15:**     SEPCO Services Agreement

**Exhibit 16:**     Palfinger Service Report

**Exhibit 17:**     Technical Integrity and Maintenance Strategy Standard

### III.
### FACTUAL BACKGROUND

Shell Offshore is the registered owner and operator of the Auger, a floating platform in the Gulf of Mexico fixed to the Outer Continental Shelf.[2] Dkt. 89-4 at 1; *see also* Ex. 12 at 1 (Shell Incident Report). It contracted with Mr. Earnest's employer, SEPCO, to provide certain services on its platform. Ex. 15 (SEPCO Agreement). SEPCO in turn assigned Mr. Earnest to be captain of the quarterly launch of one of Shell Offshore's lifeboats called "Lifeboat 6." Shell Offshore must maintain and regularly test all of its lifeboats, including Lifeboat 6, for the Auger to remain in operation. Ex. 9 at 182 (Earnest Dep.). Mr. Earnest testified that he was at all times a SEPCO employee. Ex. 9 at 40 (Earnest Dep.).

The subject incident occurred on June 30, 2019, during a test launch of Lifeboat 6. As Lifeboat 6 was being pulled back to the Auger, it abruptly fell 80 feet into the ocean below. Ex. 13 (Earnest Statement). One of the two lifting hooks that held the lifeboat failed to fully engage, and a later investigation pinpointed a frayed and badly corroded cable as the cause of the unplanned release of the hook. Ex. 12 (Shell Investigation). The defective component is an appurtenance to the lifeboat vessel, rather than the Auger.

As the owner and operator of the lifeboat, Shell Offshore knew or by the exercise of reasonable care should have known about the problems with the cable.

---

[2] Plaintiff adopts and incorporates and adopts herein all previous arguments and evidence submitted previously in Dkt. 69 and 84.

A.      **Shell Offshore's Duties As The Auger's Owner/Operator**

The Auger is regulated by the United States Coast Guard and the Bureau of Safety and Environmental Enforcement ("BSEE"). The Coast Guard's regulations require offshore lease holders, permit holders, operators, owners, contractors, and subcontractors like Shell Offshore to ensure that the workplace and their operations are maintained or conducted "in compliance with workplace safety and health regulations of this part and, in addition, free from recognized hazards." 33 C.F.R. § 142.4(a), (b).

The regulations also impose duties to maintain, inspect, and ensure the operational readiness of lifeboats, including weekly, monthly, and annual inspections. 46 C.F.R. § 109.301; *see also* Ex. 7 at 172-173 (Devaney Dep.) (testimony that Shell Offshore was intimately familiar with regulatory maintenance requirements and best practices); *see also* Ex. 17 (Shell Standards). The yearly inspection requires that "[e]ach davit, winch, fall and other launching appliance must be thoroughly inspected and repaired, as needed, once in each year." 46 C.F.R. § 109.301(f)(2). In addition, "[l]aunching appliances must be serviced at the intervals recommended in the manufacturer's instructions." C.F.R. § 109.301(i)(1). And "[l]aunching appliances must be thoroughly examined at intervals not exceeding 5 years and upon completion of the examination. 46 C.F.R. § 109.301 (i)(2).

B.      **Shell Offshore's Agreement With SEPCO**

To assist with its broad regulatory duties, Shell Offshore entered into a "Services Agreement" in September 2002 with SEPCO whereby SEPCO would provide "consultative, accounting, legal, procurement, computer, employee relations, finance, public affairs, tax, and technical services relating to the business conducted by [Shell Offshore], as [Shell Offshore] may from time to time as requested." Dkt. 89-2 at 3 (SEPCO Agreement). The SEPCO Service Agreement was explicit that

SEPCO employees on the Auger would "remain employees of SEPCO and continue to be paid by and enjoy the benefits to which they are entitled as employees of SEPCO." Dkt. 89-2 at 3.

The SEPCO Services Agreement authorized SEPCO employees to act as Shell Offshore's agent:

> When providing services hereunder SEPCO is authorized to act on SOI's behalf with the authority of an agent and to use the name of SOI when identifying on whose behalf such services are performed.

Ex. 15 at 2 (SEPCO Agreement).

But the SEPCO Services Agreement did not relieve Shell Offshore of its duties as the Auger's owner/operator. It provides that:

> Nothing contained in this Agreement shall be deemed to relieve either the directors or management of SOI from the performance of their respective duties or limit the exercise of their powers and authority under the law.

Ex. 15 at 3 (SEPCO Agreement). Thus, Shell Offshore was at all times ultimately responsible for conducting required inspections, testing, and maintenance of its lifeboats, though it authorized and relied on SEPCO to assist with these duties "from time to time as requested." Dkt. 89-2 at 3 (SEPCO Agreement).

**C.   Shell Offshore's Agreement With Palfinger**

In addition to SEPCO, Shell Offshore contracted with its codefendant in this litigation, Palfinger Marine USA, Inc. ("Palfinger"), for lifeboat-inspection services. Ex. 14 (Palfinger Service Agreement). Generally, the Palfinger Services Agreement required Palfinger to provide "[s]ervice on Lifeboats . . . *as requested* by Company's authorized representative[.]" Ex. 14 at 41 (Palfinger Agreement).

When requested by Shell Offshore's authorized representative—i.e., SEPCO—Palfinger conducted condition-based inspections of the Auger's lifeboats, including functionality tests in accordance with governing regulations and the International Convention for Safety of Life at Sea ("SOLAS") protocol, the International Life-Saving Appliance (LSA) Code, and the International Marine Organization (IMO) guidelines. Ex. 7 at 32-33, 53-54, 75-78, 85, 89 (Devaney Dep.).

The Palfinger Services Agreement required Palfinger to communicate with Shell Offshore, and to "comply with [Shell Offshore's] reporting requirements." Ex. 14 at 48 (Palfinger Agreement). This includes sending "notices" to Shell Offshore, *id.* at 3; giving "prompt notice of issues of correctness or sufficiency," *id.* at 13; and providing "complete, accurate, and up-to-date" documentation of its work, *id.* The Palfinger Services Agreement also required Palfinger to "immediately notify" Shell Offshore when it identified risks in connection with its work. *Id.* at 46. Palfinger also regularly completed "Service Reports" that it sent to its "customer," "Shell Offshore." Ex. 16 (Palfinger Service Report); Ex. 7 at 93-95 (Devaney Dep.). These included follow up tasks. *See, e.g.,* Ex. 7 at 37 (Devaney Dep.).

**D.      Shell Offshore Knew Or Should Have Known About The Corroded Cable**

SEPCO, as Shell's authorized agent, requested Palfinger to perform services on the platform in the months leading up to the June 30, 2019, incident. Ex. 3 at 22-24, 53-55, 46-49, (Favaloro Dep.); Ex. 8 at 28, 56-57 (Debenport Dep.). Lifeboat 6 was due for an in-depth *five-year inspection* of Lifeboat 6 but that inspection never happened. Ex. 3 at 22-24 (Favaloro Dep.); Ex. 7 at 84 (Devaney). This five-year inspection would have included replacing a lifeboat's cables. Ex. 3 at 62-63 (Favaloro Dep.).

13

Palfinger service engineer Jason Kemp and assistant Jacob Lanier performed annual inspections on Lifeboats 1, 2, 3, 6, 7, and 8 from June 5-11, 2019, as well as the 5-year davit cable change on Lifeboats 1 and 3. Ex. 10 at 7 (McSwain Report); Ex. 7 at 87 (Devaney Dep.). The two Palfinger inspectors observed and documented "severe" rust on the aft control cable of Lifeboat 6. Ex. 1 at 29, 114 (Kemp Dep.); Ex. 4 at 77 (Lanier Dep.). They took this photograph:



Mr. Kemp testified that he informed Daniel Bolton, SEPCO's Marine Supervisor and SEPCO's job sponsor, about the corrosion he saw on the aft control cable on Lifeboat 6. He further testified that he verbally recommended that Shell Offshore replace the cable. Ex. 1 at 28-32, 36, 85, 92-95, 114-15, 133-34 (Kemp Dep.); Ex. 2 at 38 (Bolton Dep.); Ex. 10 (McSwain Report); Ex. 11 at 6-8 (Phillips Report); Ex. 2 at 52-58, 60-61, 67-68 (Bolton Dep); Ex. 7 at 102 (Devaney Dep.); Ex. 16 (Service Report). Palfinger also completed a report signed by Mr. Kemp on June 11, 2019. Ex. 16 (Palfinger Report). The report, addressed to Shell Offshore, and its contact person Jeff Debenport, SEPCO's general planner, also identified problematic hook-release cabling and recommended that Shell Offshore replace it. *See* Ex. 1 at 28-32, 36, 93-95, 114-15, 133-34 (Kemp Dep.); Ex. 10 (McSwain

Report); Ex. 11 at 6-8 (Phillips Report); Ex. 2 at 52-58, 60-61, 67-68 (Bolton Dep); Ex. 8 at 8, 14 (Debenport Dep.).

### E.    The Corroded Cable Causes Mr. Earnest's Injuries

The hook-release cabling was never replaced. As a result, it failed while Lifeboat 6 was being raised from the ocean with Mr. Earnest and his crewmates on board following a test. The Lifeboat fell 80 feet as a result, killing two of Mr. Earnest's crew mates and seriously injuring him. *See* Ex. 1 at 141 (Kemp Dep.); Ex. 6 at 19-24 (Pittman Dep.); Ex. 12 (Incident Report); *see also* Ex. 10 (McCswain Report); Ex. 11 (Phillips Report).

The cause of the fall is not really disputed. The Shell investigation report described the incident as follows: "[T]he aft hook of the lifeboat released from the aft fall cable causing the aft of the lifeboat to fall and swing forward away from the platform while the forward hook was still attached to the forward fall cable." Ex. 12 (Shell Incident Report). The equipment is shown below:



Ex. 12 at 2 (Shell Incident Report). Shell's incident report continues that "the primary reason the aft hook opened was due to the damage of the control cable between the aft hook and the hook release unit at the helmsman console." Ex. 12 at 6.1 (Shell Incident Report).

The push-pull mechanics of the control cable rely on the integrity of the various layers. Ex. 10 (McSwain Report). And the outer layers of the control cable broke apart as shown on the below photograph taken of the cables in Lifeboat 6:



Ex. 12 at 24 (Shell Incident Report). Shell commissioned an independent investigation that identified the specific reason the cable failed as corrosion:

> The results of the investigation indicate that the unintended release of the Aft Hook of Lifeboat 6 was a result of a degraded and compromised Aft Push-Pull Release Cable. The cable exhibited significant corrosion, full penetration around the circumference, [sic] of the structural layer (conduit)[,] allowing for externally applied loads to rotate the Aft Hook release mechanism.

Ex. 11 at 5 (Phillips Report). And the Plaintiff's retained experts from McSwain Engineering agree that the aft control cable failed because of corrosion because of "breaches of the polymer mantle that encased them." Ex. 10 (McSwain Report).

**F.       The Summary Judgment Motion**

Shell Offshore now seeks summary judgment on Mr. Earnest's state law claims against it for negligence and premise liability. The crux of its argument is that because only SEPCO employees—and not Shell Offshore employees—were involved in the inspection and daily maintenance of Lifeboat 6, Mr. Earnest cannot show the requisite knowledge for a premise liability claim under

article 2322 or the requisite knowledge and control for a claim for liability for a defective thing under articles 2317 and 2317.1.

First and foremost, this ignores Shell Offshore's, non-delegable duty as the vessel owner to identify and rectify all unseaworthy conditions and make sure that the vessel and its appurtenances are fit for their intended purposes. *Foster v. Destin Trading Corp.*, 700 So. 2d 199, 209 (La. 1997) ("The owner of a vessel has a duty to furnish a seaworthy vessel. This duty is absolute and nondelegable."). Under section 905(b), a worker covered by the LHWCA "may pursue a tort action against the owner of a vessel for acts of vessel negligence." *Levene v. Pintail Enterprises, Inc.*, 943 F.2d 528, 531 (5th Cir. 1991).

And Shell Offshore is also liable under Louisiana premises defect law because it had constructive or actual knowledge of the defective cable because its authorized agents at SEPCO were told of the danger by Palfinger, who also memorialized this finding in a report addressed to Shell Offshore and at least received by Shell Offshore's authorized agents at SEPCO.

Shell Offshore's motion should thus be denied.

## VI.
### THE COURT SHOULD DENY SHELL OFFSHORE'S MOTION

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of fact exists only "[i]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether the movant is entitled to summary judgment, the Court views facts in the light most favorable to the nonmovant and draws all reasonable inferences in his

favor. *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528 (5th Cir.1997). "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir.1995).

Against these standards, summary judgment should be denied.

## A.   Shell Offshore Is Liable Under Section 905(b) in its Capacity as a Vessel Owner

Claims made under Section 905(b) of the Longshore and Harbor Workers' Compensation Act ("LHWCA") are statutory maritime claims that allow "an injured non-seaman to pursue a cause of action against the owner of a vessel for injuries received because of the negligence of that vessel." *Diamond Offshore Co. v. A&B Builders, Inc.*, 75 F. Supp. 2d 676, 681–82 (S.D. Tex. 1999), aff'd in part, vacated in part, 302 F.3d 531 (5th Cir. 2002); 33 U.S.C. § 905(b). Under Section 905(b) a vessel owner is liable to an injured non-seaman:

1)   if the vessel owner fails to warn on turning over the ship of hidden defects of which he should have known.

2)   for injury caused by hazards under the control of the ship.

3)   if the vessel owner fails to intervene in the stevedore's operations when he has actual knowledge both of the hazard and that the stevedore, in the exercise of obviously improvident judgment, means to work on in the face of it and therefore cannot be relied on to remedy it.

*Robinson v. Orient Marine Co.*, 505 F.3d 364, 365 (5th Cir. 2007) (citing *Pimental v. LTD Canadian Pac. Bul*, 965 F.2d 13, 15 (5th Cir.1992)).

Thus, there are three succinct duties owed: (1) the "Turnover Duty," (2) the "Active–Control Duty," and (3) the "Duty to Intervene." [3] *Hudson v. Schlumberger Tech. Corp.*, 452 Fed.

---

[3]   *Callahan v. Gulf Logistics, LLC*, 6:06 CV 0561, 2009 WL 891888, at *9 (W.D. La. Mar. 31, 2009) ("courts in the Western District of Louisiana have since applied Kermarec's 'reasonable care under the circumstances' standard when evaluating a vessel owner's negligence pursuant to § 905(b) when the

Appx. 528, 536 (5th Cir. 2011) (unpublished); *McLaurin v. Noble Drilling (US) Inc.*, 529 F.3d 285, 290 (5th Cir. 2008) ("Under § 905(b), a vessel owner owes a duty to exercise reasonable care to make the vessel safe if he actively participates in the operations or maintains control over the area, or if such a duty is imposed upon him by contract or law."); *Levene v. Pintail Enterprises, Inc.*, 943 F.2d 528, 533 (5th Cir.1991) (to recover under the LHWCA, plaintiff must show breach and proximate cause).

Lifeboat 6 is unquestionably a vessel. Indeed, the Supreme Court, relying on 1 U.S.C. § 3, held that a "vessel "is any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment." *Stewart vs. Dutra Const. Co.*, 543 U.S. 481, 497 (2005) (holding that dredge was "vessel" for purposes of Jones Act). According to the Supreme Court, it is *not* necessary that the watercraft in question be used "primarily" for transportation on water, or even be in motion or transit at the time of the accident. *Id.* at 495; *see also Lozman v. City of Riviera Beach, Fla.*, 568 U.S. 115, 118 (2013) (considering whether a reasonable observer consider the structure to be "designed to [any] practical degree for carrying people [and] things over water."). Nor is there any dispute that Shell Offshore owned the vessel. Indeed, Shell's motion concedes the point.

Shell's motion likewise concedes that there are triable issues of fact about whether Shell violated its Section 9(b) duties. As discussed herein, there is ample evidence that:

- Shell Offshore knew of a specific, hidden hazard relating to Life Boat 6's aft hook cable; Palfinger's investigation earlier in the month revealed the defective condition and Palfinger's investigators warned Shell Offshore's agents of this hazard, Ex. 1 at 28-32, 36, 85, 90-95, 114-15, 133-34, 168-70

plaintiff is a longshoreman by virtue of working on the Outer Continental Shelf." (citing *Parta v. Grand Isle Shipyard, Inc.*, 06–844, 2008 WL 5262728 (W.D.La.12/17/2008)).

(Kemp Dep.); Ex. 3 at 66 (Favaloro Dep.); Ex. 10 (McSwain Report); Ex. 11 at 6-8 (Phillips Report); Ex. 12 (Shell Incident Report);

- Shell did not warn Mr. Earnest or his crewmates of this danger, Ex. 9 at 194-195 (Earnest Dep.);

- Mr. Earnest and his crewmates did not have independent knowledge of the danger, Ex. 9 at 189, 194-195 (Earnest Dep.);

- Mr. Earnest and his crewmates were injured by this hazard, Ex. 13 (Statement).

There is thus an abundance of evidence for a jury to find that Shell breached its 905(b) duties, causing Plaintiff's injury. *See Robinson*, 505 F.3d at 365; *Diamond Offshore Co.*, 75 F. Supp. 2d at 681–82.

## B.     Shell Is Liable Under Article 2322

Per article 2322 of the Louisiana Civil Code:

> The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice or defect in its original construction. However, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known of the vice or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.

LA. CIV. CODE ART. 2322. Thus, to recover under article 2322, a plaintiff need only establish: "(1) ownership of the building; (2) the owner knew or, in the exercise of reasonable care, should have known of the ruin or defect; (3) the damage could have been prevented by the exercise of reasonable care; (4) the defendant failed to exercise such reasonable care; and (5) causation." *Broussard v. State ex rel. Office of State Bldgs.*, 113 So.3d 175, 182–83 (La.2013).[4] A plaintiff establishes knowledge via

---

[4] Under Louisiana law, negligence and premises-liability claims require plaintiffs to prove different, albeit similar, elements. *Compare Thibodeaux*, 74 So. 3d at 853 (elements of negligence), *with Broussard*, 113 So.

evidence of *actual or constructive knowledge. See, e.g., Burmaster v. Plaquemines Parish Gov't*, 982 So. 2d 795, 799 (La. 2008). Further, article 2322 liability may be imposed on owners based on defects or ruinous conditions in the building itself, or in the building's "appurtenances." *Id.* (holding that article 2322 applied to a crane on offshore drilling platform); *see also Olsen v. Shell Oil Co.*, 365 So.2d 1285, 1289-91 (La. 1978) (approving *Moczygemba* and the application of Article 2322 to appurtenances); La. Civ. Code art. 466.

Shell Offshore admits that it is the "owner and operator of Auger as well as Lifeboat No. 6." Dkt. No. 89-4 at 2; *see also Moczygemba v. Danos & Curole Marine Contractors, Inc.*, 561 F.2d 1149, 1151–52 (5th Cir. 1977) (recognizing that an offshore platform owner is an "owner of a building" under article 2322). It also does not raise the third, fourth, or fifth elements of an article 2322 claim in its motion.[5] Shell Offshore only seeks summary-judgment based on the knowledge element.

"The determination of whether an owner or custodian had actual or constructive knowledge of a defective condition is generally a question of fact. *Krueger v. La Quinta Inn & Suites*, 2018-0052 (La. App. 1 Cir. 9/21/18) (La. App. 1st Cir. Sept. 21, 2018) (citing *Alvarado v. Lodge at the Bluffs, LLC*, 217 So. 3d 429, 433 (La. App. 1st Cir. 2017), *writ denied*, 219 So. 3d 340 (La. 2017); *see also,*

---

3d at 182–83 (elements of premises liability under Article 2322), and *Graupmann*, 136 So.3d at 867 (elements of premises liability under Article 2317.1).

[5]  The "unreasonable risk of harm to others" prong is "peculiarly a question for the jury or trier of the facts." *Reed v. Wal-Mart Stores, Inc.*, 708 So. 2d 362, 364 (La. 1998); Broussard v. State ex rel. Off. of State Bldgs., 113 So. 3d 175, 183 (La. 2013) ("As a mixed question of law and fact, it is the fact-finder's role—either the jury or the court in a bench trial—to determine whether a defect is unreasonably dangerous."); *see also Prince v. Rouse's Enterprises*, L.L.C., 305 So. 3d 1078, 1086 (La. App. 5th Cir. 2020) ("Whether a risk is unreasonable is a factual matter that must be determined in light of each particular case's facts and circumstances, not a simple rule of law which can be applied mechanically to the facts of the case."). There is substantial evidence here that a corroded hook-lift cable is an unreasonable risk of harm. *See, e.g.*, Ex. 2 at 82 (Bolton Dep.) (Daniel Bolton, a ballast control officer for Shell testifying that had he known about the frayed cable he would have taken Lifeboat 6 out of service "without hesitation.").

*e.g.*, *Sharp v. City of Houston*, 164 F.3d 923, 930 (5th Cir. 1999); *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265 (5th Cir. 1991). ("[S]ummary judgment is seldom appropriate in cases wherein particular states of mind are decisive elements of a claim or defense"). Under article 2322, knowledge can be established two ways: (i) actual knowledge of the defective hook-release cable; or (ii) constructive knowledge—i.e., evidence that Shell Offshore could have discovered the defect had it exercised reasonable care. Here, there is more than a scintilla of evidence of both actual and constructive knowledge.

### 1.   *Shell Offshore had actual knowledge via its authorized agent, SEPCO.*

Companies like Shell Offshore acquire knowledge through their agents. *E.g.*, *Poth v. Small, Craig & Werkenthin, L.L.P.*, 967 S.W.2d 511, 515 (Tex. App.–Austin 1998, pet. denied). An agent's knowledge is imputed to the company so long as the agent acts within the scope of authority and the knowledge relates to matters within the scope of that authority. *E.g.*, *In re Hellenic Inc.*, 252 F.3d 391, 395 (5th Cir. 2001); *see also Bell v. Demax Mgt. Inc.*, 824 So. 2d 490, 493 (La. App. 4th Cir. 2002) ("It is a well settled principle that knowledge possessed by the agent is imputed to the principal even if the agent neglected to specifically convey those facts to the principal."); *see also* RESTATEMENT (THIRD) OF AGENCY § 5.03 (2006).

Under the SEPCO Services Agreement, SEPCO is Shell Offshore's agent "[w]hen providing services [under the Services Agreement]" as it was when it hired and received information from Palfinger "on Shell Offshore's behalf with the authority of an agent." Ex. 15 at 2 (SEPCO Agreement). Weeks before the subject incident, Palfinger's inspectors observed and documented "severe" rust on the aft control cable of Lifeboat 6 and reported the same to SEPCO. Ex. 1 at 29, 114 (Kemp Dep.); Ex. 4 at 77 (Lanier Dep.). Palfiger also issued "Service Reports" to "Shell Offshore"

discussing the corroded cable. Ex. 16 (Service Report). Under the SEPCO Services Agreement, telling SEPCO's employees is the same thing as telling Shell Offshore, and a jury could find actual knowledge on this evidence.

### 2. Shell Offshore would have known about the defective cable if it exercised reasonable care.

"The concept of constructive knowledge imposes a reasonable duty to *discover* apparent defects in things[.]" *Thibodeaux V. Allstate Ins. Co.*, 293 So. 3d 797, 805 (La. App. 5th Cir. 2020), *writ denied sub nom. Thibodeaux v. Allstate Ins. Co.*, 297 So. 3d 762 (La. 2020). "[C]onstructive knowledge entails a reasonable duty to *inquire or investigate.*" *Fulltime Restoration Inc. v. State Farm Fire & Cas. Co.*, 2:21-CV-01981, 2022 WL 90179, at *3 (W.D. La. Jan. 7, 2022). "Louisiana law imputes the owner or custodian with knowledge of the defect if the defect is of such a character or has existed for such a period of time that a reasonable custodian or owner would have discovered it." *Dawson v. Rocktenn Services, Inc.*, 674 Fed. Appx. 335, 340 (5th Cir. 2016) (unpublished); *see also LeBlanc v. City of Abbeville*, 259 So. 3d 372, 387 *(La. App. 3d Cir. 2018)* (City had constructive knowledge of *rusted* condition of storm grate, which "presumably become progressively worse [over time].").[6]

Under federal regulations, Shell Offshore was responsible for ensuring that operations on the Auger were performed "in compliance with workplace safety and health regulations of this part and, in addition, free from recognized hazards." 33 C.F.R. § 142.4(a), (b). Shell Offshore also had duties to maintain, inspect, and ensure the operational readiness of lifeboats, including weekly, monthly, and annual inspections. 46 C.F.R. § 109.301; *see also* Ex. 7 at 172-173 (Devaney Dep.)

---

[6] Whether a custodian or owner of a thing has constructive knowledge of a defect in that thing is inextricably linked with the exercise of reasonable care. *See Walters v. City of W. Monroe*, 162 So. 3d 419 (La. App. 2d Cir. 2015), writ denied, 170 So. 3d 161 (La. 2015).

(testimony that Shell Offshore was intimately familiar with regulatory maintenance requirements and best practices); *see also* 46 C.F.R. § 109.301(f)(2) (requiring that "[e]ach davit, winch, fall and other launching appliance must be thoroughly inspected and repaired, as needed, once in each year"); C.F.R. § 109.301(i)(1) (requiring that "[l]aunching appliances must be serviced at the intervals recommended in the manufacturer's instructions"); 46 C.F.R. § 109.301 (i)(2) (requiring that "[l]aunching appliances must be thoroughly examined at intervals not exceeding 5 years and upon completion of the examination").

Despite its regulatory obligations, Shell Offshore did not ensure that Mr. Earnest's workplace was free from hazards or that the Auger's Lifeboats were operationally ready. It also failed to change out Lifeboat 6's launching and lifting equipment even though it was due because 5 years had expired. *See* Ex. 3 at 22-24, 62-63 (Favaloro Dep.); Ex. 7 at 84 (Devaney).  Shell Offshore had at least constructive knowledge of this fact because 5 years had lapsed without replacing the launching equipment—so Shell Offshore at least should have known the hook-release cable system needed to be replaced. *See* Ex. 3 at 23 (Favaloro Dep.). Plus, the nature of corrosion grows worse slowly over time which raises a question of fact about when Shell Offshore should have discovered the defect before the accident. *See Lewis v. Jazz Casino Co., L.L.C.*, 245 So. 3d 68, 76 (La. App. 4th Cir. 2018), writ denied, 252 So. 3d 877 (La. 2018) ("whether or not the condition existed for such a length of time sufficient to constitute constructive notice is a fact question that must be submitted to the jury."). A jury could thus find that Shell Offshore had constructive knowledge of the defective cable.

**C.**     **Shell Offshore Is Liable Under Article 2317 and 2317.1.**

A jury could also find Shell Offshore liable under articles 2317 and 2317.1 of the Louisiana Civil Code. *See Olsen*, 365 So.2d at 1290 (stating that even if an offshore drilling platform were not

a building within the meaning of Article 2322, liability could be shown under Article 2317 for "things"). Article 2317 provides that: "[t]he owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage. . . ." LA. CIV. CODE ART. 2317.1. The Louisiana Supreme Court has held that "under most circumstances, ownership alone establishes the requisite benefit, control and authority to find garde." *Giorgio v. All. Operating Corp.*, 921 So. 2d 58, 73 (La. 2006) (quoting *Doughty v. Insured Lloyds Ins. Co.*, 576 So. 2d 461, 464 (La. 1991).

At a minimum, ownership creates a *presumption* of custody under Article 2317, and Shell Offshore carries the burden to rebut that presumption. *Giorgio*, 921 So.2d at 73; *see also Truxillo v. Louisiana Stadium and Exposition Dist.*, 172 So. 3d 79 (La. App. 4th Cir. 2015). And "the issue of garde is a factual determination." *Id.* at 82. The inquiry turns on "whether the defendant had the right of direction or control over the thing and what, if any, benefit the defendant derived from the thing." *Cavet v. ABC Ins. Co.*, 316 So. 3d 91, 100 (La. App. 4th Cir. 2021), writ denied, 324 So. 3d 92 (La. 2021) (citing *Chesney v. Entergy Louisiana, L.L.C.*, 245 So. 3d 281, 286 (La. App. 2d Cir. 2017), writ denied, 236 So. 3d 1262 (La. 2018)). What is more, the Court need not decide between Shell Offshore and SEPCO. "The concept of garde is broader than ownership, and *more than one party may have garde of a thing*." *Dupree v. City of New Orleans*, 765 So. 2d 1002, 1009 (La. 2000).

Shell Offshore admits the necessary "right" when it admitted that it "*operates*" the Auger as well as Lifeboat No. 6. Dkt. No. 89-4 at 2. While Shell Offshore contracted with SEPCO to provide certain services, it did not completely hand over the reins. The SEPCO Services Agreement retains Shell Offshore's right of direction and management to perform all its duties on the Auger. Ex. 15 at

25

3 (SEPCO Agreement). The evidence also shows that Palfinger inspected Shell Offshore's lifeboats (and changes the cables) only when Shell Offshore told it to. Ex. 14 at 41 (Palfinger Agreement) (Palfinger only to provide "[s]ervice on Lifeboats (TEMPSC) and or Rescue Craft *as requested* by Company's authorized representative"). Shell Offshore would sometimes change their own cables out. Ex. 7 at 185 (Devany Dep.). And Shell Offshore required Palfinger to document and report its work, presumably so Shell Offshore could make operational decisions.

As for the second component, Shell Offshore unquestionably benefits from the Auger's oil and gas production. Dkt. 89-4 at 1.

Given the evidence that Shell Offshore owned and operated the Auger, retained some right of direction and control over the work on Auger, and benefited from the profits, fact issues precludes summary judgment.

### D.  Mr. Earnest And His SEPCO Coworkers Were Not Borrowed Servants

Whether a borrowed employee relationship exists is a question of law. *Castille v. Apache Deepwater LLC,* 2017 WL 2814068, at *3 (W.D. La. June 27, 2017). But that question is rooted in a factually intense inquiry. *Id.* So any factual disputes must be resolved before the court can determine whether a defendant is entitled the borrowed employee defense. *Id.*; *see also Raymo v. Cargill Inc.,* 2014 WL 545872, at *2 (W.D. La. Feb. 7, 2014); *Singleton v. Fieldwood Energy, LLC,* 2016 WL 3902599, at *3 (E.D. La. July 19, 2016).

In *Ruiz v. Shell Oil Company,* the Fifth Circuit laid out nine factors that courts should consider when a defendant claims to be a borrowed employer. *Vincent v. Fieldwood Energy, L.L.C.,* 2015 WL 6758269, at *1 (E.D. La. Nov. 5, 2015) (citing *Ruiz v. Shell Oil Co.,* 413 F.2d 310, 312-13 (5th Cir. 1969)). The factors are as follows:

26

(1)     Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?

(2)     Whose work is being performed at the time of the accident?

(3)     Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

(4)     Did the employee acquiesce in the new work situation?

(5)     Did the original employer terminate his relationship with the employee?

(6)     Who furnished tools and place for performance?

(7)     Was the new employment over a considerable length of time?

(8)     Who had the right to discharge the employee?

(9)     Who had the obligation to pay the employee?[7]

*Id.* at *2 (E.D. La. Nov. 5, 2015); *see also Jorge-Chavelas v. Louisiana Farm Bureau Cas. Ins. Co.*, 307 F. Supp. 3d 535, 555 (M.D. La. 2018).

While no single factor, or combination of them, is determinative, the Fifth Circuit has considered the first factor—control—to be central. *Mays v. Dir., Off. of Workers' Comp. Programs*, 938 F.3d 637, 642 (5th Cir. 2019); *Vincent v. Fieldwood Energy, L.L.C.*, 2015 WL 6758269, at *2 (E.D. La. Nov. 5, 2015).

An examination of the *Ruiz* factors here shows that five factors counsel against the borrowed employee status: first, second, third, fourth, and ninth. There is not evidence on the remaining four factors.

---

[7]     *Id.* at *2 (E.D. La. Nov. 5, 2015). *See also Jorge-Chavelas v. Louisiana Farm Bureau Cas. Ins. Co.*, 307 F. Supp. 3d 535, 555 (M.D. La. 2018).

Shell Offshore admits the first factor—control over the work being performed—is undisputed and weighs against borrowed servant status. Shell Offshore had no one on site and thus exercised no control. Dkt. 89-1 at 14.

The second factor—whose work is being performed—likewise cuts against borrowed employee status because at the time of the accident Mr. Earnest was performing work assigned to him by SEPCO. Dkt. 89-4 at 2.

The third factor—whether there was an agreement—also weighs against borrowed-servant status. It expressly provides that SEPCO employees "remain employees of SEPCO." Ex. 15 at 1 (SEPCO Agreement).

The fourth factor—whether the person acquiesced—also cuts against Shell Offshore's position. Mr. Earnest's testimony was that he worked for SEPCO—not Shell Offshore. *See* Ex. 9 at 40 (Earnest Dep.).

Finally, the ninth factor favors—who paid the person's salary—counsels against borrowed-servant status. The SEPCO Service agreement is also explicit that SEPCO employees "continue to be paid by and enjoy the benefits to which they are entitled as employees of SEPCO." Dkt. 89-4 at 3; *see also* Ex. 15 at 1 (SEPCO Agreement).

Mr. Earnest and his coworkers at SEPCO are better understood as "*non*-servant" agents for Shell Offshore. *Blanchard v. Ogima*, 215 So. 2d 902, 906 (La. 1968) ("The master-servant relationship cannot be equated with the principal-agent relationship."); *see also Cook v. John Hancock Life Ins. Co. (U.S.A)*, 7:12-CV-00455, 2015 WL 178108, at *15 (W.D. Va. Jan. 14, 2015) (recognizing that "the actions of an independent contractor who is also an agent (sometimes called a "nonservant agent") can result in liability for the principal so long as those acts are committed within the scope of the

agent's apparent or actual authority"). Per the SEPCO Services Agreement, SEPCO employees were authorized to: act on [Shell Offshore's] behalf with the authority of an agent." Ex. 15 at 2 (SEPCO Agreement). In all other respects, Shell Offshore and SEPCO agreed that SEPCO employees would remain SEPCO Employees. The borrowed-servant defense is thus unavailable to Shell Offshore here.

**E.   The Court Should Reconsider its prior Ruling on Mr. Earnest's Claims under LHWCA 905(b).**

Mindful of the Court's prior memorandum ruling, Dkt. No. 85, Mr. Earnest respectfully requests that this Court reconsider its holding that general maritime law does not apply to Mr. Earnest's claims of its own force.[8]

First, Shell Offshore has never disputed that Lifeboat 6 is a "vessel" nor that his claims occurred on navigable water, thus the location component of the two-part test used to determine whether maritime law applies of its own force is easily satisfied. *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534, 115 S. Ct. 1043, 1048, 130 L. Ed. 2d 1024 (1995) (describing the location and connection test).  And the general features of this incident have the potential to disrupt navigation or commerce of a busy waterway. *See, e.g., Hupp*, 2013 WL 3208588, at *4.

The Court's decision turned on the maritime connection test. While Mr. Earnest claims may be linked in a tangential way to the development of the OSC, the connection is not so great as to eclipse the application of traditional maritime law considering Shell Offshore's status as the vessel owner and that its defective vessel caused Mr. Earnest's injuries over navigable waters. Courts regularly apply maritime law in this way to personal injuries on vessels used in support of oil and

---

[8] Plaintiff adopts and incorporates and adopts herein all previous arguments and evidence submitted previously in Dkt. 69 and 84.

gas. *See e.g., Strong v. B.P. Expl. & Prod., Inc.*, 440 F.3d 665, 669 (5th Cir. 2006) (failing to provide a safe workplace on a vessel while providing wireline work in support of oil and gas platform is a traditional maritime tort). The Court should deny Defendant's motion as to Plaintiff's claims under maritime law and under Section 905(b) accordingly.

## V.
### CONCLUSION

For these reasons, the Court should deny Shell Offshore's Motion. At a minimum, fact issues are present, precluding summary disposition of Plaintiff's claims.

<u>**Dated: May 9, 2022**</u>

Respectfully submitted,

ARNOLD & ITKIN LLP

_____
Noah M. Wexler
LA Bar Roll No. 34995
Ben Bireley
LA Bar Roll No. 37587
835 Louisiana Avenue
Baton Rouge, LA 70802
225-412-6348 (Telephone)
jaiteam@arnolditkin.com
e-service@arnolditkin.com
nwexler@arnolditkin.com
bbireley@arnolditkin.com

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that this motion was served on counsel of record for all parties via electronic filing

on May 9, 2022.


*/s/ Noah M. Wexler*
Noah M. Wexler