UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| JEREMY EARNEST | CASE NO. 6:20-CV-00685 LEAD |
| VERSUS | JUDGE ROBERT R. SUMMERHAYS |
| PALFINGER MARINE USA INC ET AL | MAGISTRATE JUDGE CAROL B. WHITEHURST |

MEMORANDUM RULING

The present matters before the Court are the Motion for Partial Summary Judgment on Contractual Defense and Indemnity Obligations Versus Shell Offshore, Inc. [ECF No. 88] filed by Palfinger Marine, USA, Inc. ("Palfinger") and the Motion for Summary Judgment [ECF No. 90] filed by Shell Offshore, Inc., Shell Exploration & Production Company, and Shell Oil Companies (collectively, the "Shell Entities"). Both motions address Palfinger's claims for contractual and tort indemnity against the Shell Entities.

## I.
### BACKGROUND

Plaintiffs' claims in this matter arise from a June 30, 2019, accident involving a lifeboat that fell from its moorings on a floating, tension leg oil and gas exploration and development platform—the Auger platform. The Auger platform is "located on and permanently attached to the Outer Continental Shelf ("OCS") at Garden Banks Block 426" in the Gulf of Mexico approximately 130 miles due south of Vermillion Parish.[1] At the time of the incident, Auger had approximately 18 producing wells and associated production facilities with the sole purpose of the

---

[1] *See Patty Dupre et. al. v. Palfinger Marine USA Inc. et. al.*, No. 6:20-00756, 2022 WL 885867 (W.D. La. Mar. 24, 2022).

exploration and production of minerals on the Outer Continental Shelf.[2] The lifeboats on Auger are safety equipment required by the United States Coast Guard for exploration and production operations being conducted on the platform.[3] The lifeboats on Auger are necessary to support and sustain the workers on the platform by providing a means to evacuate the platform in the event of an emergency.[4]

In 2018, Shell Offshore and Palfinger entered into a purchase and maintenance contract for lifeboats to be used on Shell's Offshore platforms.[5] The scope of the contract specifically includes annual inspections, repairs, and 5-year cable change outs.[6] The contract requires execution of individual purchase orders for work to be performed and, in turn, each purchase order "is a stand-alone contract between the parties" and "incorporates the terms of" the purchase and maintenance contract.[7] The contract further provides that Shell must indemnify Palfinger for "death injury, or disease of any person in Company Group[,]" which includes Shell employees.[8] The indemnification agreement excludes liabilities that "do not arise in connection with the CONTRACT or are unrelated to the SCOPE of the CONTRACT" as well as those caused by the gross negligence/willful misconduct of Palfinger employees.[9]

Palfinger asserts a contractual indemnity claim under the purchase and maintenance contract.[10] A few weeks prior to the incident, Palfinger performed annual inspections of six

---

[2] ECF No. 90, Exhibit 1, Declaration of Jose A. Rincon at ¶ 2.
[3] *Id.* at ¶ 3.
[4] *Id.* at ¶ 4.
[5] ECF No. 90, Exhibit 2, Shell-Palfinger Purchase Contract.
[6] *Id.* at p. 41.
[7] *Id.* at 13 (Section 1(a)).
[8] *Id.* at 22 (Section 7.2). Two of the plaintiffs for which Palfinger seek indemnity were employees of Shell Exploration & Production Company. The third decedent, Gary Marcel, was an employee of Danos, Inc., a contractor of Shell Offshore Inc.
[9] *Id.* at 23 (Sections 7.5(b)(i) & (ii)).
[10] *See,* for example, Palfinger's Cross Claim and Third-Party Complaint in the Earnest case, Rec. Doc. 52 at 3-5, which identifies the 2018 Purchase Contract as the applicable contract.

lifeboats on Auger, including Lifeboat No. 6, as well as the 5-year davit wire change for Lifeboats Nos. 1 and 3 pursuant to Purchase Order #4513428944 (the "June 2019 Purchase Order").[11] During that inspection, Jason Kemp—Palfinger's lead service engineer—observed and photographed a corroded aft hook release cable in Lifeboat No. 6, and wrote in his service report "recommend hook release cables."[12]

The June 2019 Purchase Order incorporated Palfinger's Quotation FA5412944, which described the scope of work for the June 2019 service as "annual inspections of lifeboats 1,2,3,6,7,8 and 5yr davit cable change on lifeboats 1 & 3 aboard 'SHELL AUGER.'"[13] In his deposition, Mr. Kemp explained that the annual inspections involved work to both the components of the platform, such as checking for rust and corrosion on the platform's davit and ensuring the fall cables were properly adjusted, as well as to the lifeboats, such as checking the air bottles, seat belts, and sprinkler systems.[14] The work performed by Palfinger occurred from the Auger platform.[15]

Palfinger has asserted a contractual indemnity claim against Shell Offshore and tort contribution/indemnity claims against the Shell Entities associated with all personal injury and wrongful death claims arising from the Lifeboat No. 6 accident.[16] The Shell Entities argue that contractual indemnity provisions are barred by the Louisiana Oilfield Anti-Indemnity Act, and further, that any tort indemnity claims no longer exist under any arguable law.

---

[11] ECF No. 90, Exhibit 3, Purchase Order #4513428944.
[12] ECF No. 90, Exhibit 4, Deposition of Jason Kemp at pp. 99-100; and Exhibit 5, June 2019 Palfinger Service Report.
[13] ECF No. 90, Exhibit 6.
[14] ECF No. 90, Exhibit 4, Deposition of Jason Kemp at pp. 172-176.
[15] *Id.* at p. 174.
[16] ECF No. 42 (claims of Dupre family); ECF No. 52 (claims by Jeremy Earnest); and ECF No. 53 (claims of Marcel family).

## II.
### SUMMARY JUDGMENT STANDARD

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought."[17] "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[18] "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party."[19] As summarized by the Fifth Circuit:

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. However, where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial.[20]

When reviewing evidence in connection with a motion for summary judgment, "the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached."[21] "Credibility determinations are not part of the summary judgment analysis."[22] Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the

---

[17] Fed. R. Civ. P. 56(a).
[18] *Id.*
[19] *Quality Infusion Care, Inc. v. Health Care Service Corp.*, 628 F.3d 725, 728 (5th Cir. 2010).
[20] *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir.1994) (internal citations omitted).
[21] *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir.2001); *see also Feist v. Louisiana, Dept. of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (court must view all facts and evidence in the light most favorable to the non-moving party).
[22] *Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 458 (5th Cir. 2002).

existence of an element essential to that party's case, and on which that party will bear the burden of proof."[23]

### III.
### LAW AND ANALYSIS

Shell contends that the indemnification obligations in the Shell-Palfinger purchase and maintenance contract are unenforceable. Specifically, Shell argues that the purchase and maintenance contract falls under the choice of law provision of the Outer Continental Shelf Lands Act ("OCSLA"), and that OCSLA provides that Louisiana law governs the contract. Accordingly, the contract's indemnification obligations are unenforceable under the Louisiana Oilfield Anti-Indemnification Act (the "Anti-Indemnification Act").[24] The Anti-Indemnification Act "declare[s] null and void and against public policy of the state of Louisiana any provision in any agreement which requires defense and/or indemnification, for death or bodily injury to persons, where there is negligence or fault (strict liability) on the part of the indemnitee."[25] Palfinger counters that OCSLA does not apply to the maintenance contract because the maintenance contract is a maritime contract governed by maritime law, and that the indemnification obligations in the contract are enforceable under maritime law. In sum, the threshold question for the Court is whether OCSLA's choice-of-law provision applies to the Shell-Palfinger purchase and maintenance contract.

#### A. Does OCSLA's Choice-of-Law Provision Apply to the Purchase and Maintenance Contract?

OCSLA grants subject matter jurisdiction to the federal courts over cases and controversies "arising out of or in connection with" any operation involving the "development" of minerals on

---

[23] *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004) (alterations in original) (quoting *Celotex v. Catlett*, 477 U.S. 317, 322 (1986)).
[24] La. R. S. § 9:2780.
[25] La. R. S. § 9:2780(A).

the Outer Continental Shelf.[26] OCSLA's primary concern is "to treat the artificial structures covered by the Act as upland islands or as federal enclaves within a landlocked State, and not as vessels, for the purposes of defining the applicable law because maritime law was deemed inapposite to these fixed structures."[27] OCSLA's choice-of-law provision, 43 U.S.C. § 1333(a)(2)(A), states that:

> To the extent that they are applicable and not inconsistent with this Act or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State now in effect or hereafter adopted, amended, or repealed are hereby declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf ....[28]

Under this provision, OCSLA "extends federal law to the Outer Continental Shelf and borrows adjacent state law as a gap-filler."[29] As explained by the Supreme Court, "[t]he purpose of the [OCSLA] was to define a body of law applicable to the seabed, the subsoil, and the fixed structures ... on the outer [sic] Continental Shelf."[30] The Fifth Circuit has articulated a three-part test, known as the *Rodrigue/PLT* test, for determining whether OCSLA requires application of state law to a dispute: (1) the controversy must arise on a situs covered by OCSLA; (2) federal maritime law must not apply of its own force; and (3) the state law must not be inconsistent with federal law.[31]

The Fifth Circuit specifically addressed the OCSLA situs prong of the *Rodrigue/PLT* test in the context of a contractual indemnification claim in *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*.[32] There, in an *en banc* decision, the Fifth Circuit explained that its prior precedent had

---

[26] 43 U.S.C. § 1349(b)(1)(A).
[27] *Offshore Logistics v. Tallentire*, 477 U.S. 207, 217, 106 S. Ct. 2485, 91 L.Ed.2d 174 (1986).
[28] 43 U.S.C. § 1333(a)(2)(A).
[29] *Texaco Expl. & Prod., Inc., v. AmClyde*, 448 F.3d 760, 772
[30] *Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 354, 89 S. Ct. 1835, 1836 (1969).
[31] *See Tetra Techs., Inc. v. Continental Ins. Co.*, 814 F.3d 733, 738 (5th Cir. 2016).
[32] 589 F.3d 778 (5th Cir. 2009).

incorrectly used a tort analysis to determine the situs of a contractual indemnity claim.[33] In other words, prior precedent had held that the situs of a contractual indemnity claim was governed by the location where the tort that triggered the indemnity claim occurred. The *Grand Isle Shipyard* court rejected this analysis in favor of a "focus-of-the-contract" test for determining the situs of a contract claim.[34] Using this analysis, a contractual indemnity claim "arises on an OCSLA situs if a majority of the performance called for under the contract is to be performed on stationary platforms or other OCSLA situses enumerated in 43 U.S.C. § 1333(a)(2)(A)."[35] According to the court, "[i]t is immaterial whether the underlying incident that triggers the indemnity obligation occurs on navigable waters or on a platform or other OSCLA situs."[36] In *Grand Isle Shipyard*, the indemnity provision at issue was contained in a maintenance contract between Grand Isle and BP American Production Company involving work performed almost exclusively on oil and gas exploration and production platforms governed by OCSLA.[37] The indemnification claim, however, was triggered when a worker was injured while being transported by a Seacor vessel from one platform to another.[38] According to the court, even though the underlying tort occurred aboard a vessel on navigable water, contract contemplated that a majority of the performance due under the contract would occur on an OCLSA situs—i.e. a BP platform.[39]

Here, a majority of the performance due under the Shell-Palfinger maintenance agreement was to occur on Auger platform, which is an OCSLA situs. Specifically, the June 2019 Purchase Order incorporated Palfinger's Quotation FA5412944, which described the scope of work for the June 2019 service as "annual inspections of lifeboats 1,2,3,6,7,8 and 5yr davit cable change on

---

[33] *Id.* at 785-87.
[34] *Id.* at 787.
[35] *Id.*
[36] *Id.*
[37] *Id.* at 781-82.
[38] *Id.*
[39] *Id.* at 789.

lifeboats 1 & 3 aboard 'SHELL AUGER.'"[40] In his deposition, Mr. Kemp explained that the annual inspections involved work to both the components of the platform, such as checking for rust and corrosion on the platform's davit and ensuring the fall cables were properly adjusted, as well as to the lifeboats, such as checking the air bottles, seat belts, and sprinkler systems.[41] The work performed by Palfinger occurred from the Auger platform.[42] Any work involving test runs of the lifeboats on navigable water were only incidental to the work performed on the platform. Accordingly, Shell has satisfied the first requirement for applying OCSLA's choice-of-law provision.

Next, the Court must decide whether Shell has satisfied the second prong of the *Rodrigue/PLT* test—whether maritime law applies of its own force to the Shell-Palfinger purchase and maintenance contract. In *In re Larry Doiron, Inc.*, the Fifth Circuit, in an *en banc* ruling, redefined the analysis for determining whether a contract is a maritime contract.[43] *Doiron* involved a work order to perform flow-back services on a gas well in navigable waters.[44] The work originally did not require vessels and the parties did not expect to use vessels.[45] However, the work eventually required the use of a crane barge to complete the job.[46] The injury at issue occurred when the crane on the crane barge struck and killed a worker.[47] Sitting *en banc*, The Fifth Circuit rejected its prior precedents for determining whether a contract is a maritime contract. The court instead adopted a simplified analysis grounded on the answers to questions:

    1.    First, is the contract one to provide services to facilitate the drilling or production of oil and gas on navigable waters?

---

[40] ECF No. 90, Exhibit 6.
[41] ECF No. 90, Exhibit 4, Deposition of Jason Kemp at pp. 172-176.
[42] *Id.* at p. 174.
[43] *In re Larry Doiron, Inc.*, 879 F.3d 568, 570 (5th Cir. 2018) (*en banc*),
[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] *Id.*

2. Second, if the answer to the above question is "yes," does the contract provide or do the parties expect that a vessel will play a substantial role in the completion of the contract?[48]

If the answers to both questions are "yes," the contract is a maritime contract and maritime law applies.[49] The court concluded that this revised test would "harmonize [Fifth Circuit] law with" the Supreme Court's decision in *Norfolk Southern Railway Co. v. Kirby*.[50] In *Kirby*, the Supreme Court ruled that whether a contract is maritime depends on "the nature and character of the contract" with the fundamental interest being "the protection of maritime commerce."[51] Applying this analysis to the facts in the record, the court held that the contract in *Doiron* was not a maritime contract because "[t]he use of the vessel to lift the equipment was an insubstantial part of the job and not work the parties expected to be performed."[52] In *Barrios v. Centaur, LLC*, the Fifth Circuit held that the *Doiron* test applies not only to oil and gas contracts but also to mixed-services contracts.[53]

Here, while the Shell-Palfinger purchase and maintenance contract involved "services to facilitate the drilling or production of oil and gas on navigable waters," the record does not reflect that a vessel will play a substantial role in the completion of the contract. The contract did not provide, nor did the parties expect, that a vessel would play a substantial role in the completion of the contract. Specifically, the contract provided for annual inspections involving work to the components of the Auger platform, such as checking for rust and corrosion on the platform's davit and ensuring the fall cables were properly adjusted, as well as to the lifeboats, such as checking

---

[48] *Id.* at 576.
[49] *Id.*
[50] 543 U.S. 14, 125 S. Ct. 385, 160 L.Ed.2d 283 (2004); see also *Barrios v. Centaur, LLC*, 942 F.3d 670, 675 (5th Cir. 2019).
[51] 543 U.S. at 15 (citing *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603, 608, 111 S. Ct. 2071, 114 L.Ed.2d 649 (emphasis added)).
[52] *Id.* at 577.
[53] *Barrios v. Centaur, LLC*, 942 F.3d 670, 673 (5th Cir. 2019).

the air bottles, seat belts, and sprinkler systems.[54] Based upon the deposition testimony of Mr. Kemp, all work done on the lifeboats under the contract was performed on the Auger platform and not on any vessel.[55]

Palfinger, however, ignores *Doiron* and instead argues that the parties' purchase and maintenance contract is purely maritime in nature as it involves only vessels—lifeboats. Palfinger appears to suggest that *Doiron* is inapplicable in the present case because the purchase and maintenance contract is "inherently and historically maritime in nature, making the *Doiron/Kirby* analysis unnecessary."[56] Alternatively, Palfinger argues that the purchase and maintenance contract is maritime in nature under the *Doiron* test for the same reason—that the contract involves only vessels. Simply put, Palfinger argues that the purchase and maintenance contract is automatically a maritime contract because it involves maintenance on components related to the platform's lifeboats. The Court disagrees. First, Fifth Circuit jurisprudence dictates that the *Doiron* test be used to determine whether a contract is a maritime contract.[57] Second, the mere fact that the lifeboats may satisfy the definition of a vessel does not transform the contract into a maritime contract. *Doiron* involved a vessel as well. However, as in the present case, the *Doiron* court concluded that the vessel was only incidental to the performance of the contract. Moreover, the lifeboats in the present case were not functioning as maritime vessels but rather functioned as safety equipment supporting the oil and gas exploration and production operations of the Auger platform on the outer-continental shelf. The lifeboats did not engage in maritime commerce, nor did they support maritime commerce. As the Supreme Court in *Kirby* instructed, the primary focus

---

[54] ECF No. 90, Exhibit 4, Deposition of Jason Kemp at pp. 172-176.
[55] *Id.* at p. 174.
[56] ECF No. 92 at 2.
[57] *See In re Crescent Energy Servs., LLC for Exoneration from or Limitation of Liab.*, 896 F.3d 350 (5th Cir. 2018) (the court noted that prior maritime cases "improperly focus[ed] on whether services were inherently maritime as opposed to whether a substantial amount of the work was to be performed from a vessel" as the *Doiron* court now requires.

in determining whether a contract is maritime depends on "the nature and character of the contract" with the fundamental interest being "the protection of maritime commerce."[58]

In sum, the Shell-Palfinger purchase and maintenance contract is not a maritime contract under *Doiron*. Accordingly, the second prong of the *Rodrigue/PLT* test is satisfied because maritime law "does not apply of its own force."

The third and final prong of the *Rodrigue/PLT* test requires that the Court find that the application of state law is not inconsistent with federal law. "[T]he Fifth Circuit has specifically held that 'nothing in the Anti-Indemnification Act is inconsistent with federal law.'"[59] In sum, all three prongs of the *Rodrigue/PLT* test are satisfied based on the summary judgment record. Accordingly, Louisiana law applies to the Shell-Palfinger purchase and maintenance contract—and the indemnification obligations contained in that contract—as surrogate federal law.

### B. The Louisiana Anti-Indemnification Act.

Louisiana's Anti-Indemnification Act precludes indemnity agreements that (1) "pertain[] to a well for oil, gas, or water, or drilling for minerals" and (2) are related to "exploration, development, production, or transportation of oil, gas, or water."[60] Contracts are considered to "pertain to" a well under the Anti-Indemnification Act analysis if the contract services are necessary to sustain the manpower or equipment needed for a platform to produce oil and gas from wells.[61] The Fifth Circuit has specifically held that contracts to provide and maintain lifesaving

---

[58] 543 U.S. at 15 (citing *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603, 608, 111 S. Ct. 2071, 114 L.Ed.2d 649 (emphasis added)).
[59] *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 789 (5th Cir. 2009) (quoting *Hodgen v. Forest Oil Corp.*, 87 F.3d 1512, 1529).
[60] LSA- R.S. § 9:2780(B) & (C); *see also Transcontinental Gas Pipe Line Corp. v. Trans. Ins. Co.*, 953 F.2d 985, 991 (5th Cir. 1992).
[61] *See Broussard v. Conoco, Inc.*, 959 F.2d 42, 43-45 (5th Cir. 1992) (holding a contract for a caterer to feed the production workers and maintain their living quarters pertained to a well and finding a "'functional nexus' arises from the fact that production employees are unquestionably necessary for production from a well").

safety equipment on a platform, "pertain to" a well.[62] As such, the first element of the Anti-Indemnification Act test is satisfied. As to the second element, there is no dispute that Auger's sole purpose is the exploration and production of minerals on the outer-continental shelf. The Court concludes that both elements are satisfied, and thus the Anti-Indemnification Act precludes the indemnity agreement contained in the Shell-Palfinger contract.

### C. Palfinger's Other Arguments.

Palfinger alternatively argues that, if state law applies, a choice-of-law provision in the purchase and maintenance contract requires the application of Texas law, which does not prohibit indemnity agreements. The Court disagrees. The Fifth Circuit has specifically held that OCSLA's choice of law provision is mandatory "[b]ecause OSCLA's choice of law scheme is prescribed by Congress, parties may not voluntarily contract around Congress's mandate."[63] Accordingly, the choice-of-law clause in the contract cannot alter the choice of law rule set forth in OCSLA.

Finally, Palfinger asserts that the Shell Entities "are liable for tort indemnity, or contribution in proportion to their fault as vessel defendants under LHWCA § 905(b)."[64] The Court previously ruled that § 905(b) is inapplicable in this case as maritime law is not applicable.[65] Further, even if general maritime law did apply, the availability of common law indemnity under maritime law is limited after the Supreme Court replaced tort indemnity with the doctrine of comparative fault.[66] The Fifth Circuit has recognized that "Louisiana law allows claims for tort indemnity only when the third-party plaintiff's negligence is passive or its fault is only technical or theoretical."[67] The allegations of negligence against Palfinger in this case involve active

---

[62] *Roberts v. Energy Dev. Corp.*, 104 F.3d 782, 783 (5th Cir. 1997).
[63] *Petrobras Am., Inc., v. Vicinay Cadenas, S.A.*, 815 F.3d 211, 216 (5th Cir. 2016).
[64] ECF No. 42, 52, and 53.
[65] *See Patty Dupre et. al. v. Palfinger Marine USA Inc. et. al.*, No. 6:20-00756, 2022 WL 885867 (W.D. La. Mar. 24, 2022).
[66] *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S. Ct. 1708, 44 L.Ed.2d 251 (1975).
[67] *Threlkeld v. Haskins Law Firm*, 922 F.2d 265, 266 (5th Cir. 1991).

negligence and therefore no claim for tort indemnity would apply. Thus, under either maritime law or Louisiana law, there would be no basis for a claim for tort indemnity.

For the foregoing reasons, the Court finds that there are no valid claims by Palfinger for contractual or tort indemnity and, accordingly, those claims are dismissed. The Motion for Partial Summary Judgment on Contractual Defense and Indemnity Obligations Versus Shell Offshore, Inc. [ECF No. 88] filed by Palfinger is DENIED. The Motion for Summary Judgment [ECF No. 90] filed by the Shell Entities is GRANTED. Palfinger's claims for contractual and/or tort indemnity against the Shell Entities are DISMISSED.

THUS DONE in Chambers on this 12th day of August, 2022.

ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE