UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| **JEREMY EARNEST** | **CASE NO. 6:20-CV-00685 LEAD** |
| **VERSUS** | **JUDGE ROBERT R. SUMMERHAYS** |
| **PALFINGER MARINE USA INC ET AL** | **MAGISTRATE JUDGE CAROL B. WHITEHURST** |

MEMORANDUM RULING

The present matters before the Court are the Motion for Summary Judgment [ECF No. 60] filed by Shell Oil Company ("Shell Oil") and the Motion for Summary Judgment [ECF No. 89] filed by Shell Offshore, Inc. ("Shell Offshore"). Earnest opposes both motions.

## I.
### BACKGROUND

Plaintiffs' claims in these consolidated matters arise from a June 30, 2019, accident involving a lifeboat that fell from its moorings on a floating, tension leg oil and gas exploration and development platform—the Auger platform. Plaintiffs assert claims against Shell Oil under the Longshore & Harbor Workers Compensation Act ("LHWCA"). Plaintiffs also assert claims against Palfinger Marine USA, Inc. ("Palfinger"), alleging that Palfinger was responsible for annually inspecting the ten lifeboats on the Auger platform.[1] Plaintiffs also allege that Palfinger is "the owner and/or manufacturer of the control release cables and/or the release handle to the hooks on the lifeboats."[2] Plaintiffs allege that the release cable, the handle to the hooks, and/or

---

[1] ECF No. 80, ¶ 11.
[2] *Id.* at ¶ 14.

the cable system used to hoist Lifeboat No. 6 were defective.[3] They also allege that Shell Offshore was negligent in not maintaining and inspecting the hook and cable system for Lifeboat No. 6.[4]

On March 24, 2022, the Court issued a Memorandum Ruling on a motion filed by Shell in a related case that has now been consolidated with this matter—*Dupre v. Palfinger*.[5] In that ruling, the Court concluded that Louisiana law, and not maritime law, applied to the incident based on the choice of law provision contained in the Outer Continental Shelf Lands Act ("OCSLA").[6] Accordingly, the Court dismissed plaintiffs' Harbor Workers Compensation Act claims.

## II.
### SUMMARY JUDGMENT STANDARD

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought."[7] "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[8] "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party."[9] As summarized by the Fifth Circuit:

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. However, where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating

---

[3] *Id.*
[4] *Id.* at ¶ 13.
[5] *Dupre v. Palfinger*, Case No. 6:20-cv-756, ECF No. 79.
[6] 43 U.S.C. § 1333(a)(2)(A).
[7] Fed. R. Civ. P. 56(a).
[8] *Id.*
[9] *Quality Infusion Care, Inc. v. Health Care Service Corp.*, 628 F.3d 725, 728 (5th Cir. 2010).

by competent summary judgment proof that there is an issue of material fact warranting trial.[10]

When reviewing evidence in connection with a motion for summary judgment, "the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached."[11] "Credibility determinations are not part of the summary judgment analysis."[12] Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof."[13]

## III.
### ANALYSIS

**A. Maritime Claims.**

Shell Oil and Shell Offshore argue that Louisiana law applies to the present case as surrogate federal law under OCSLA and that, accordingly, Earnest's maritime claims should be dismissed. The Court's summary judgment ruling on this question in *Dupre* was based on the same incident and same factual underpinnings as the present case. Here, plaintiff has raised no grounds to reconsider the Court's ruling in *Dupre* that Louisiana law applies pursuant to OCLSA. Accordingly, the Court will grant Shell Oil's motion in this respect. Louisiana law applies to the present case, precluding claims under maritime law, and specifically precluding claims under the LHWCA. Plaintiff's maritime claims against Shell Oil are therefore

---

[10] *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir.1994) (internal citations omitted).
[11] *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir.2001); *see also Feist v. Louisiana, Dept. of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (court must view all facts and evidence in the light most favorable to the non-moving party).
[12] *Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 458 (5th Cir. 2002).
[13] *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004) (alterations in original) (quoting *Celotex v. Catlett*, 477 U.S. 317, 322 (1986)).

DISMISSED. In addition, Earnest's maritime claims against Shell Offshore are similarly dismissed on the same grounds.

### B. State Law Claims.

Earnest also asserts Louisiana state law claims against Shell Offshore. Specifically, he asserts claims under (1) Louisiana Civil Code Art. 2315; (2) Civil Code Art. 2317; and (3) claims for "[o]ther acts of negligence, negligence per se, and gross negligence which will be shown more fully at trial."[14] Shell Offshore argues that Earnest cannot prevail on his state law negligence claims because Shell Offshore had no employees on the Auger platform and that any negligence on the part of Palfinger and SEPCO employees cannot be imputed to Shell.[15] Specifically, Shell Offshore asserts that any claim under Civil Code Article 2315, Louisiana's general negligence statute, requires proof of a negligent act or omission by one of its employees. Shell then argues that Earnest cannot prove his negligence claim against Shell because Shell Offshore had no employees working on the platform. Shell Offshore makes this same argument in challenging Earnest's claim under Louisiana Civil Code Article 2317.1. In his opposition, Earnest did not respond to Shell Offshore's arguments with respect to Article 2315 but alleges that he can establish a claim under Louisiana Civil Code Articles 2317.1 and 2322.

Louisiana Civil Code Article 2317 provides that "[w]e are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody." Article 2317 further provides that "[t]his, however, is to be understood with the following modifications." Article 2317.1 modifies this duty by providing that "[t]he owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the

---

[14] ECF No. 80, ¶ 19.
[15] ECF No. 89-1, p. 1.

exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage. . . ." Shell Offshore argues that, because it had no employees on the Auger platform, Earnest cannot, as a matter of law, establish that Shell Offshore "knew or, in the exercise of reasonable care, should have known" of the defective condition of the aft control cable of Lifeboat 6. Earnest, however, argues that there is sufficient evidence in the summary judgment record to create a triable issue as to whether Shell Offshore knew or should have known of the defective condition of the cable system. The Court agrees.

The record reflects that Shell Offshore is the registered owner and operator of the Auger platform which, in turn, is regulated by the United States Coast Guard.[16] The Coast Guard's regulations require offshore lease holders, permit holders, operators, owners, contractors, and subcontractors like Shell Offshore to ensure that the workplace and their operations are maintained or conducted "in compliance with workplace safety and health regulations of this part and, in addition, free from recognized hazards."[17] The regulations also impose duties to maintain, inspect, and ensure the operational readiness of lifeboats, including weekly, monthly, and annual inspections.[18] The yearly inspection requires that "[e]ach davit, winch, fall and other launching appliance must be thoroughly inspected and repaired, as needed, once in each year."[19] In addition, "[l]aunching appliances must be serviced at the intervals recommended in the manufacturer's instructions."[20] And "[l]aunching appliances must be thoroughly examined at intervals not exceeding 5 years and upon completion of the examination."[21]

---

[16] ECF No. 89-4, Statement of Material Facts.
[17] 33 C.F.R. § 142.4(a), (b).
[18] 46 C.F.R. § 109.301.
[19] 46 C.F.R. § 109.301(f)(2).
[20] 46 C.F.R. § 109.301(i)(1).
[21] 46 C.F.R. § 109.301 (i)(2).

The record further reflects that Shell Offshore entered into a services agreement with SEPCO in September 2002 (the "SEPCO Services Agreement"). This agreement required SEPCO to provide "consultative, accounting, legal, procurement, computer, employee relations, finance, public affairs, tax, and technical services relating to the business conducted by [Shell Offshore], as [Shell Offshore] may from time to time as requested."[22] The SEPCO Services Agreement states that SEPCO employees on the Auger would "remain employees of SEPCO and continue to be paid by and enjoy the benefits to which they are entitled as employees of SEPCO."[23] The SEPCO Services Agreement further states that "[w]hen providing services hereunder SEPCO is authorized to act on SOI's behalf with the authority of an agent and to use the name of SOI when identifying on whose behalf such services are performed."[24] Finally, the SEPCO Services Agreement states that "[n]othing contained in this Agreement shall be deemed to relieve either the directors or management of SOI from the performance of their respective duties or limit the exercise of their powers and authority under the law."[25]

The record also reflects that Shell Offshore contracted with Palfinger for lifeboat inspection services.[26] The Palfinger Services Agreement required Palfinger to provide "[s]ervice on Lifeboats . . . as requested by Company's authorized representative[.]"[27] The Palfinger Services Agreement required Palfinger to communicate with Shell Offshore, and to "comply with [Shell Offshore's] reporting requirements."[28] Those reporting requirements included sending notices to Shell Offshore;[29] giving "prompt notice of issues of correctness or

---

[22] ECF No. 89-2 at p. 3 (SEPCO Agreement).
[23] *Id.*
[24] *Id.*, at p. 2.
[25] *Id.*, at p. 3.
[26] ECF No. 97, Exhibit 14 (Palfinger Services Agreement).
[27] *Id.*, at p. 41.
[28] *Id.*, at p. 48.
[29] *Id.*, at p. 3.

sufficiency;"[30] and providing "complete, accurate, and up-to-date" documentation of its work.[31] The Palfinger Services Agreement also required Palfinger to immediately notify Shell Offshore when it identified risks in connection with its work.[32]

Earnest points to evidence in the record that SEPCO, as Shell Offshore's authorized agent, requested that Palfinger perform services on the platform prior to the June 30, 2019, incident.[33] Palfinger service engineer Jason Kemp and assistant Jacob Lanier performed annual inspections on Lifeboats 1, 2, 3, 6, 7, and 8 from June 5-11, 2019, as well as the 5-year davit cable change on Lifeboats 1 and 3.[34] The Palfinger inspectors observed and documented "severe" rust on the aft control cable of Lifeboat No. 6.[35] Kemp testified that he informed Daniel Bolton, SEPCO's Marine Supervisor and SEPCO's job sponsor, about the corrosion he saw on the aft control cable on Lifeboat No. 6. He further testified that he verbally recommended that Shell Offshore replace the cable.[36] Palfinger also completed a report signed by Kemp on June 11, 2019.[37] The report, *addressed to Shell Offshore* and Jeff Debenport (SEPCO's general planner), also identified problematic hook-release cabling and recommended that Shell Offshore replace it.[38]

Earnest further argues that the summary judgment record creates a triable issue as to whether Shell Offshore was negligent in failing to ensure that operations on the Auger were performed "in compliance with workplace safety and health regulations of this part and, in

---

[30] *Id.*, at p. 13.
[31] *Id.*
[32] *Id.*, at p. 46.
[33] ECF No., 97, Ex. 3 at 22-24, 53-55, 46-49, (Favaloro Deposition.); Ex. 8 at 28, 56-57 (Debenport Deposition).
[34] ECF No. 97, Ex. 10 at p. 7 (McSwain Report); Ex. 7 at p. 87 (Devaney Deposition).
[35] ECF No. 97, Ex. 1 at 29, 114 (Kemp Deposition); Ex. 4 at 77 (Lanier Deposition).
[36] *Id.*, at 28-32, 36, 85, 92-95, 114-15, 133-34 (Kemp Deposition).
[37] ECF No. 97, Ex. 16 (Palfinger Report).
[38] ECF No. 97, Ex. 1 at 28-32, 36, 93-95, 114-15, 133-34 (Kemp Deposition).

addition, free from recognized hazards."[39] According to Earnest, Shell Offshore had the duty to maintain, inspect, and ensure the operational readiness of lifeboats, including weekly, monthly, and annual inspections.[40] However, Earnest points to evidence in the summary judgment record that Lifeboat No. 6 was due for an in-depth five-year inspection but that an inspection was never performed.[41] According to Earnest, that five-year inspection would have included replacing the lifeboat's cables.[42]

In sum, there is a genuine question of material fact as to whether Shell Offshore knew or should have known about the defective condition on the Auger platform regardless of whether Shell maintained its own employees on the platform. Specifically, the defective condition was noted in a report addressed to Shell Offshore. There is no evidence in the record that would preclude a reasonable inference that Shell Offshore received the report and was made aware of the defect. Even if Shell Offshore did not receive the report, its agent, SEPCO, was made aware of the defect during the course of performing its duties to Shell Offshore under the SEPCO Services Agreement. An agent's knowledge may be imputed to that agent's principal if the agent is acting within the scope of authority and the knowledge relates to matters within the scope of that authority.[43]

Shell Offshore further contends that SEPCO's knowledge of the defective condition of the lifeboat cable system can only be imputed to Shell if SEPCO's employees were the "borrowed employees" of Shell. If SEPCO's employees were "borrowed employees," Shell

---

[39] 33 C.F.R. § 142.4(a), (b).
[40] 46 C.F.R. § 109.301.
[41] ECF No. 97, Ex. 3 at 22-24 (Favaloro Deposition); Ex. 7 at 84 (Devaney Deposition).
[42] ECF No. 97, Ex. 3 at 62-63 (Favaloro Deposition).
[43] *See* RESTATEMENT (THIRD) OF AGENCY § 5.03 (2006); *In re Hellenic Inc.*, 252 F.3d 391, 395 (5th Cir. 2001); *see also Bell v. Demax Mgt. Inc.*, 824 So. 2d 490, 493 (La. App. 4th Cir. 2002) ("It is a well settled principle that knowledge possessed by the agent is imputed to the principal even if the agent neglected to specifically convey those facts to the principal.").

Offshore argues that it is entitled to immunity under the LHWCA as the borrowing employer, as Earnest was a SEPCO employee.[44] Shell Offshore's argument is flawed in at least two respects. First, Earnest points to evidence in the record that creates a triable issue as to whether Shell Offshore was actually informed of the defective cable—*i.e.*, the June 11th Kemp report addressed to Shell Offshore. If so, Earnest need not rely on the argument that SEPCO's knowledge can be imputed to Shell. Second, Shell Offshore's argument confounds Earnest's imputation argument with vicarious liability. Earnest contends that Shell Offshore is independently liable for negligence and that Shell Offshore knew or should have known about the allegedly defective condition of the lifeboat cable based on the knowledge of its agent, SEPCO. Shell Offshore essentially recharacterizes this argument as an argument for imputing the negligence of SEPCO's employees to Shell Offshore under a theory of vicarious liability. Shell then contends that the negligence of SEPCO's employees can only be imputed to Shell if they were Shell's borrowed employees. The Court disagrees. As explained above, there is evidence in the record that creates genuine questions of material fact as to Shell Offshore's knowledge and negligence independent of any theory of imputed negligence or vicarious liability. Accordingly, Shell Offshore's "borrowed employee" argument does not support summary judgment.[45]

For the foregoing reasons, the Court concludes that there are genuine questions of material fact with respect to Earnest's Louisiana state law claims. Accordingly, Shell Offshore's motion is denied as to those claims.

---

[44] ECF No. 89-1, pp. 9-12.
[45] Shell Offshore also challenges Earnest's Article 2322 claim on essentially the same grounds. In addition, Shell challenges whether the claim was properly asserted. For the reasons previously stated, the Court concludes that there are genuine questions of material fact as to Earnest's Article 2322 claim. The Court further concludes that the claim was properly raised.

IV.
CONCLUSION

Based upon the Court's prior Memorandum Ruling,[46] the maritime claims asserted by Earnest against both Shell Oil and Shell Offshore are DISMISSED. Shell Oil's Motion for Summary Judgment [ECF No. 60] is GRANTED. Shell Offshore's Motion for Summary Judgment [ECF No. 89] is GRANTED IN PART. However, the Court finds that there are genuine issues of material fact regarding Earnest's claims under Louisiana law. Accordingly, Shell Offshore's motion is DENIED IN PART as to those claims.

THUS DONE in Chambers on this 19th day of August, 2022.

ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE

---

[46] *Dupre v. Palfinger,* Case No. 6:20-cv-756, ECF No. 79.