UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

JEREMY EARNEST

VERSUS

PALFINGER MARINE USA INC ET AL

CASE NO.  6:20-CV-00685 LEAD

JUDGE ROBERT R. SUMMERHAYS

MAGISTRATE JUDGE CAROL B. WHITEHURST

RULING

Before the Court is a Motion for Summary Judgment [ECF No. 202] filed by Palfinger Marine, USA, Inc. ("Palfinger") and Zurich American Insurance Company ("ZAIC"), as well as a Cross-Motion for Summary Judgment [ECF No. 207] filed by Shell Offshore, Inc. ("Shell"). For the reasons that follow, Palfinger's and ZAIC's motion [ECF No. 202] is DENIED and Shell's motion [ECF No. 207] is GRANTED.

I.
BACKGROUND

On June 30, 2019, during a quarterly operational test of a lifeboat on Shell's Auger Tension Leg Platform (the "Auger platform") on the Outer Continental Shelf off the shore of Louisiana, the lifeboat fell to the water, causing injuries to the helmsman and the deaths of two other members of the lifeboat crew. The injured helmsman and survivors of the decedents ("Plaintiffs") filed suit against Palfinger, ZAIC, and Shell Oil Company. The parties subsequently agreed to settle all claims asserted by Plaintiffs. Palfinger and ZAIC now move for summary judgment on their claims for indemnity against Shell. Shell also moves for summary judgment seeking the dismissal of Palfinger's and ZAIC's indemnity claims.

1

## A. The Purchase Contract.

In 2018, Palfinger and Shell entered into a purchase contract (the "Purchase Contract"), by which Palfinger agreed to furnish Shell with tools, equipment, materials, software, labor, and supervision for the provision of inspection and repair services pertaining to lifeboats and associated platform equipment on Shell's platforms.[1] At that time, the Auger had approximately eighteen producing wells and associated production facilities with the sole purpose of the exploration and production of minerals on the Outer Continental Shelf.[2] The scope of the Purchase Contract is broadly defined but specifically includes annual inspections, equipment repairs, and 5-year winch cable changeouts.[3]

Shell also agreed to indemnify Palfinger for liabilities in respect of death or injury of any person in the Company Group (including the employees of Shell and its affiliates), "regardless of the cause of the liabilities" and "regardless of the negligence, breach of statutory or other duty, or other fault of the indemnified party."[4] The Purchase Contract also includes a choice-of-law provision calling for the application of Texas law.[5]

## B. The June 2019 Purchase Order.

The Purchase Contract requires individual purchase orders for Palfinger to perform services and, in turn, each purchase order "is a stand-alone contract between the parties" and "incorporates the terms of" of the Purchase Contract.[6] A few weeks prior to the incident, Palfinger was performing work on the Auger platform pursuant to Purchase Order #4513428944 (the "June 2019

---

[1] ECF No. 209-4 at 41.
[2] ECF No. 209-3 at 1.
[3] ECF No. 209-4 at 41.
[4] *Id.* at 22-23.
[5] *Id.* at 38.
[6] *Id.* at 13.

2

Purchase Order").[7] This purchase order incorporated the indemnity and choice-of-law provisions of the Purchase Contract and incorporated Palfinger's Quotation FA5412944, which described the scope of work for the June 2019 service as "annual inspections of lifeboats 1,2,3,6,7,8 and 5yr davit cable change on lifeboats 1 & 3 aboard 'SHELL AUGER.'"[8]

The June 2019 Purchase Order concerned annual work that was performed on the lifeboats affixed to the Auger platform, as well as the davit station on the Auger platform. Palfinger's Service Engineer, Jason Kemp, explained that the interior inspections of the lifeboats took approximately 3-4 hours each day while the lifeboats were affixed to the Auger platform.[9] This work included checking "the seating arrangements, the seat belts, air bottles, sprinkler system, sprinkler valves, make sure the engine starts and runs, make sure the batteries are in and out of date."[10] During the annual inspections, Palfinger technicians would also launch the lifeboats to test their functionality.[11]

The remaining 6-9 working hours were spent performing work to the davit system on the Auger platform, which holds the lifeboats in place and raises and lowers them from the water.[12] Palfinger performed work to the davits, winches, falls, and bunks. Kemp would check the davit for rust or corrosion and address it where necessary.[13] He would inspect the davit winch, make sure the winch sheaves were free spinning, and would pull, clean, and grease the sheave pins and bearings where necessary.[14] Kemp would also check the boat bunks to make sure they were tied in and working

---

[7] ECF No. 209-5.
[8] *Id.* at 2; ECF No. 209-6 at 2.
[9] ECF No. 97-2 at 45.
[10] *Id.*
[11] *Id.* at 46-47.
[12] *Id.* at 46
[13] *Id.*
[14] *Id.*

properly with no cracks or missing bolts.[15] Additionally, the 5-year winch cable changeouts involved removing the old cables from the winch drum, taking measurements of the cables, and then reinstalling the new cables.[16]

This work was required by Coast Guard regulations for oil and gas operations on the Auger platform to continue. The lifeboats and davit station equipment, as well as Palfinger's yearly inspections and 5-year cable changeouts, are required by Coast Guard regulations for Shell to produce oil and gas from the Auger.[17] The Coast Guard regulations require weekly, monthly and annual inspections of the lifeboats to ensure that they are "in good working order ready for immediate use at all times while the [mobile offshore drilling] unit is in operation."[18] Specifically, the Coast Guard requires that "appliances and release gear" be "thoroughly examined at intervals not exceeding 5 years" and that the "launching appliance must be subjected to a dynamic test of the winch break."[19] The Coast Guard also requires maintenance of the "falls," or winch cables.[20] Palfinger performed this work in compliance with Coast Guard regulations.

### C. Procedural History.

On April 18, 2022, Palfinger filed a Motion for Partial Summary Judgment seeking a declaration that Shell was contractually obligated to defend and indemnify Palfinger against the claims asserted by the injured parties.[21] Shell also filed a Motion for Summary Judgment seeking dismissal of Palfinger's indemnity claims.[22] On August 12, 2022, the Court denied Palfinger's

---

[15] ECF No. 97-2 at 46.
[16] *Id.* at 22.
[17] 46 CFR § 108.525(a); 46 C.F.R. § 109.301.
[18] 46 C.F.R. § 109.301 (a) & (d)-(f).
[19] 46 C.F.R. § 109.301(i)(2).
[20] 46 C.F.R. § 109.301(j).
[21] ECF No. 88.
[22] ECF No. 90.

motion and granted Shell's motion, concluding that the Purchase Contract was not maritime in nature and that the LOAIA rendered the indemnity provisions unenforceable.[23]

The parties subsequently agreed to settle all claims asserted by Plaintiffs. Pursuant to the terms of the settlement agreement, Palfinger and ZAIC paid Plaintiffs a total amount of $14,925,000, and Shell paid $1,500,000, as consideration for the release of all claims against Palfinger, ZAIC, and the Shell entities.[24]

On September 9, 2022, Palfinger appealed the dismissal of its contractual indemnity claim against Shell.[25] On January 11, 2024, the Fifth Circuit held that the Purchase Contract was a maritime contract, reversing the dismissal of Palfinger's claim and remanding the case to the District Court, noting "[f]urther proceedings are necessary to determine whether indemnity must be paid."[26] On May 23, 2024, Shell filed a petition for writ of certiorari with the United States Supreme Court seeking review of the Fifth Circuit's decision, which was denied on October 7, 2024.[27]

## II.
### SUMMARY JUDGMENT STANDARD

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought."[28] "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[29] "A genuine issue of material fact exists

---

[23] ECF No. 132; ECF No. 133.
[24] ECF No. 168 at 5-6.
[25] ECF No. 162.
[26] *Earnest v. Palfinger Marine U S A, Inc.*, 90 F.4th 804, 806 (5th Cir.).
[27] *Shell Offshore Inc. v. Palfinger Marine USA, Inc.*, 145 S. Ct. 155, 220 L. Ed. 2d 21 (2024).
[28] Fed. R. Civ. P. 56(a).
[29] *Id.*

when the evidence is such that a reasonable jury could return a verdict for the non-moving party."[30]

As summarized by the Fifth Circuit:

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. However, where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial.[31]

When reviewing evidence in connection with a motion for summary judgment, "the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached."[32] "Credibility determinations are not part of the summary judgment analysis."[33] Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof."[34]

### III.
#### ANALYSIS

**A. Whether the Application of Texas Law is Precluded.**

"[T]he mandate rule is a corollary of the law of the case doctrine" and "compels compliance on remand with the dictates of a superior court and forecloses relitigation of issues expressly or

---

[30] *Quality Infusion Care, Inc. v. Health Care Service Corp.*, 628 F.3d 725, 728 (5th Cir. 2010).
[31] *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir.1994) (internal citations omitted).
[32] *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir.2001); *see also Feist v. Louisiana, Dept. of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (the court must view all facts and evidence in the light most favorable to the non-moving party).
[33] *Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 458 (5th Cir. 2002).
[34] *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004) (alterations in original) (quoting *Celotex v. Catrett*, 477 U.S. 317, 322 (1986)).

impliedly decided by the appellate court."[35] In this case, the Fifth Circuit's mandate requires the Court to address the effect of maritime law on Shell's indemnity obligations in the Purchase Contract.[36] The Court is "free to take any action that is consistent with the appellate mandate."[37]

The Supreme Court recently concluded that choice-of-law provisions in maritime contracts are presumptively enforceable.[38] Because the choice-of-law provision in the Purchase Contract specifies Texas law, Shell asserts that the Fifth Circuit mandate requires the enforcement of the parties' choice of Texas law to the Purchase Contract. Palfinger argues, however, that the application of Texas law is precluded under the doctrine of judicial estoppel and the mandate-waiver rule.

### a. Judicial Estoppel.

Palfinger argues that Shell is estopped from asserting the enforceability of the indemnity agreement under Texas law because it took a directly contrary position in its motion for summary judgment prior to remand, specifically, that the parties' choice of Texas law was not enforceable because Louisiana law applied by virtue of the OCSLA.

The Court recently explained that "[j]udicial estoppel is an equitable doctrine applied in the court's discretion to 'prevent[ ] a party from asserting a position in a legal proceeding that is contrary to a position previously taken by him in the same or some earlier legal proceeding.'"[39] The central purpose of the doctrine is "to protect the integrity of the judicial

---

[35] *General Universal Systems, Inc. v. Hal, Inc.*, 500 F.3d 444, 453 (5th Cir. 2007) (internal quotation omitted).

[36] *Earnest*, 90 F.4th at 806 ("The district court held the contract was not a maritime one. We conclude it is. Further proceedings are necessary to determine whether indemnity must be paid.").

[37] *Exxon Chem. Pats., Inc. v. Lubrizol Corp.*, 137 F.3d 1475, 1484 (Fed. Cir. 1998).

[38] *Great Lakes Insurance SE v. Raiders Retreat Realty Co.*, LLC, 601 U.S. 65, 70 (2024).

[39] *United States v. Glover-Wing*, 2024 WL 1435235, at *7 (W.D. La. 2024) (citing *United States v. Farrar*, 876 F.3d 702, 709 (5th Cir. 2017)).

7

process and to prevent unfair and manipulative use of the court system by litigants."[40] The Court

continued:

> The Fifth Circuit has identified three requirements that must be found before a party will be judicially estopped: (1) the party sought to be judicially estopped has asserted a legal position which is plainly inconsistent with a prior position, (2) the party convinced the court to accept its prior position, and (3) the party did not act inadvertently. An additional factor identified by the Supreme Court is 'whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'[41]

The Court finds that judicial estoppel is not implicated in this case. While Shell has changed

its position on whether the parties' choice-of-law provision is enforceable, the inconsistency arises

as a result of the Fifth Circuit's mandate. Shell only asserts its new position because it must now

address the effect of maritime law on the Purchase Contract.[42] Further, because the Court's

conclusion that the LOAIA applied to the Purchase Contract was reversed by the Fifth Circuit,

there is no risk of inconsistent determinations and Shell has not obtained an unfair advantage or

legal benefit from the Court's acceptance of its position.[43] This is not a case in which Shell is

utilizing legal tactics to manipulate and mislead the Court. Shell's original position was rejected

by the appellate court, and it must now operate under the Fifth Circuit's holding in this case. Thus,

---

[40] *Id.* (citing *Farrar*, 876 F.3d at 709).

[41] *Id.*

[42] *See e.g.*, *Cardoni v. Prosperity Bank*, 805 F.3d 573, 588-89 (5th Cir. 2015) (mandating that the district court decide, "with the benefit of fully briefing," whether an agreement was enforceable under Texas law after reversing the district court's conclusion (accepting the defendants' position) that Oklahoma law barred the enforcement of the parties' choice of Texas law).

[43] Palfinger claims, without providing evidence, that the Court's order dismissing Palfinger's claim for indemnity played a substantial role in the creation of a settlement that resulted in the dismissal of the plaintiffs' claims against Shell. While the Third Circuit has recognized that judicial estoppel may apply where a party obtained a favorable settlement by advancing a certain legal theory, *Scarano v. Central R. Co. of N. J.*, 203 F.2d 510, 512-13 (3rd Cir. 1953), the Court notes that the settlement in this case resulted in the in the dismissal of Plaintiffs' claims against both Shell *and* Palfinger. ECF No. 168 at 6. Thus, Palfinger has not shown that Shell received a legal advantage over Palfinger as a result of this Court's ruling.

Shell is not estopped from asserting that the parties' choice of Texas law is enforceable under maritime law.

### b. The "Mandate-Waiver" Rule.

Palfinger next argues that, under the "mandate-waiver" rule, Shell's argument for the application of Texas law is forfeited because it could have been raised on appeal but was not.

The mandate rule, in addition to compelling compliance on remand, also "bars litigation of issues decided by the district court but foregone on appeal or otherwise waived."[44] "[T]he waiver doctrine . . . holds that an issue that could have been but was *not* raised on appeal is forfeited and may not be revisited by the district court on remand."[45] "Conversely, an issue that is not expressly or implicitly decided on appeal does not become part of the law of the case."[46]

On appeal, the sole issue before the Fifth Circuit was whether "a contract to inspect and repair lifeboats on an oil platform located on the Outer Continental Shelf [is] a maritime contract."[47] The parties' choice of Texas law in the Purchase Contract was not relevant to the sole issue on appeal of whether Louisiana law or maritime law applied to the Purchase Contract. Thus, Shell did not waive its argument that the parties' choice of Texas law is enforceable under maritime law.

### B. The Effect of the TOAIA on Shell's Indemnity Obligation.

Because maritime law presumes the enforceability of the parties' choice–of-law provisions in maritime contracts,[48] the parties' choice of Texas law applies to the Purchase Contract. The Texas Oilfield Anti-Indemnity Act ("TOAIA") invalidates certain indemnity provisions contained in

---

[44] *United States v. Shoemaker*, 626 F. App'x 93, 96 (5th Cir. 2015).
[45] *Medical Center Pharmacy v. Holder*, 634 F.3d 830, 834 (5th Cir. 2011) (emphasis in original).
[46] *Id.* (citing *Alpha/Omega Ins. Servs., Inc. v. Prudential Ins. Co. of Am.*, 272 F.3d 276, 279 (5th Cir.2001)).
[47] *Earnest*, 90 F.4th at 806.
[48] *Great Lakes*, 601 U.S. at 70.

agreements "pertaining to a well for oil, gas, or water or to mine for a mineral."[49] The central dispute between Shell and Palfinger concerns whether the Purchase Contract is such an agreement.

Under the TOAIA, an agreement "pertains to a well" if it requires the contractor to render "well or mine services" or "to perform a part of those services or an act collateral to those services, including furnishing or renting equipment, incidental transportation, or other goods and services furnished in connection with the services. . . ."[50] The Act goes on to define "well or mine services" to include:

> (i) drilling, deepening, reworking, repairing, improving, testing, treating, perforating, acidizing, logging, conditioning, purchasing, gathering, storing, or transporting oil, brine water, fresh water, produced water, condensate, petroleum products, or other liquid commodities, or *otherwise rendering services in connection with a well* drilled to produce or dispose of oil, gas, other minerals or water; and
> (ii) designing, excavating, constructing, improving, or otherwise rendering services in connection with a mine shaft, drift, or *other structure intended for use in exploring for or producing a mineral* . . . .[51]

"If an agreement calls for well or mine services, for a part of those services, or for an act collateral to those services, it is within the scope of the TOAIA."[52] The Texas Supreme Court and the Fifth Circuit have held that "the TOAIA is to be strictly construed to permit parties to contract freely with regard to agreements not covered by the statutory language."[53]

### 1. The "Close Nexus" Requirement.

In *Graham*, the Fifth Circuit recognized that the Supreme Court of Texas has not considered the definition of "well or mine services," but, based on the holdings in Texas intermediate courts, found that the services must bear a "close nexus" with production activities

---

[49] Tex. Civ. Prac. & Rem. Code § 127.003.
[50] Tex. Civ. Prac. & Rem. Code §127.001(1)(A)(i)-(ii).
[51] *Id.* at (4)(A)(i)-(ii) (emphasis added).
[52] *In re Complaint of John E. Graham & Sons*, 210 F.3d 333, 339 (5th Cir. 2000).
[53] *Id.* (citing *Getty Oil Co. v. Insurance Co. of N. America*, 845 S.W.2d 794, 805 (Tex.1992), cert. denied sub nom.).

for the TOAIA to apply.[54] The Fifth Circuit explained that the Legislature's inclusion of the catch-all provision in subsection (4)(A)(i) "indicates an intent to expand the scope of activity constituting well or mine service to other types of work falling within the same general class or category as the activities specifically listed in the definition."[55] The court accordingly held that "a contractor is 'otherwise rendering services in connection with a well' if the services called for by the contract bear a *close nexus* to a well and are directed toward the goal of obtaining or maintaining production from a well."[56]

Shell, however, seems to contend that the Court need not decide whether the "close nexus" requirement applies because Palfinger's services in connection with the Auger platform fall squarely under subsection (4)(A)(ii): "otherwise rendering services in connection with a mine shaft, drift, or other structure intended for use in exploring for or producing a mineral."

Few courts have specifically addressed subsection (4)(A)(ii) in determining whether an agreement falls within the TOAIA. In *Dennis*, the Eastern District of Louisiana rejected the argument that the TOAIA should be applied only where there is a close nexus to a well, characterizing the Fifth Circuit's holding in *Graham* as dicta and finding that subsection (4)(A)(ii) "must reasonably be read to include all activities pertaining to covered structures, including activities related to removal of the structures after the completion of exploration and/or

---

[54] *Id.* at 339-40; *see also Catlin Specialty Ins., Co. v. L.A. Contractors, Ltd.*, No. CV H-14-261, 2016 WL 4276131, at *6 (S.D. Tex. July 25, 2016), report and recommendation adopted, No. CV H-14-0261, 2016 WL 4747689 (S.D. Tex. Aug. 15, 2016); *Transworld Drilling Co. v. Levingston Shipbuilding Co.*, 693 S.W.2d 19, 23 (Tex.App.—Beaumont 1985); *Singleton v. Crown Cent. Petroleum Corp.*, 713 S.W.2d 115, 121 (Tex.App.—Houston [1st Dist.] 1985), rev'd on other grounds, 729 S.W.2d 690 (Tex.1987); *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 20 S.W.3d 119, 128 (Tex. App.—Houston [14th Dist.] 2000).
[55] *Graham*, 210 F.3d at 342-43.
[56] *Id.* at 343.

11

production."[57] In *Catlin*, however, the Southern District of Texas criticized *Dennis* for characterizing *Graham*'s "close nexus" requirement as dicta, stating that "[t]his court is bound by the holding of the Fifth Circuit, and accordingly finds that a close nexus to services directed at obtaining or maintaining production must apply."[58]

Further, the services at issue in *Graham* were performed in connection with a platform.[59] If services rendered in connection with a platform automatically fall within the TOAIA, as Shell contends, the Fifth Circuit would not have concerned itself with creating the "close nexus" requirement. Thus, the Court finds that services must bear a close nexus to a well for the TOAIA to apply, regardless of whether the services ultimately fall under subsection (4)(A)(i) or subsection (4)(A)(ii).

### 2. Whether Palfinger's Services Had a "Close Nexus" to the Wells.

Shell argues that there was a close nexus between Palfinger's services on the Auger platform and the wells supported by the Auger platform because the lifeboats and davit station equipment were necessary for production on the Auger to continue. The Fifth Circuit did not define the term "close nexus" in *Graham* except by way of example and few cases have addressed the "close nexus" requirement since the *Graham* decision. Nevertheless, the Court finds a close nexus in this case for at least two reasons.

First, the Fifth Circuit ruled that services necessary to ensure the safety of employees manning an oil and gas production facility have a close nexus with "well services" under the

---

[57] *Dennis v. Fluid Crane and Construction, Inc.*, 823 F.Supp.2d 415, 419 (E.D. La. 2011) ("[T]he Fifth Circuit in *Graham* did not directly address the types of work to which the TOAIA applies; Energy XXI cites merely to dicta in that opinion.").
[58] *Catlin*, 2016 WL 4276131, at *6.
[59] *See Graham*, 210 F.3d at 336-37.

TOAIA. In *Graham*, the contractor performed services connecting a satellite platform to two other platforms comprising an A-B complex:

> On the satellite platform, [the contractor] fabricated and installed a manifold, connected flowlines from the three individual Christmas trees to the new manifold, and installed a pneumatic safety system. On the A–B complex, [the contractor] installed piping from the risers installed by OPI to the existing manifold, modified the safety shutdown system on the A platform to incorporate the two new incoming pipelines, and installed shut down valves and check valves. These modifications allowed the operator to segregate the product from each individual well for testing and enabled the operator to shut in any particular well in case of an emergency.[60]

The Fifth Circuit concluded that the contractor's "modification of the safety shutdown system to facilitate the preservation of the production facilities and the employees manning them in case of an emergency satisfies the requisite connection to a well."[61] Further, the contractor's services "were performed to further the goal of obtaining or maintaining production from . . . satellite wells."[62]

Here, Palfinger also performed work that was necessary to maintain the safety of employees on the Auger in the event of an emergency. Palfinger's services included the inspection and maintenance of lifeboats and davit station equipment on the Auger platform, as well as the 5-year winch cable changeouts.[63] This work was required by the Coast Guard for production on the Auger to continue.[64] Given these requirements, Palfinger's services were directed toward "maintaining production from a well."[65]

Palfinger, however, argues that Fifth Circuit precedent concerning maritime contract analysis weighs against the finding of a close nexus. In *Genesis*, the Fifth Circuit found that a

---

[60] *Graham*, 210 F.3d at 336-37.
[61] *Id.* at 343.
[62] *Id.*
[63] ECF No. 97-2 at 22, 45-47.
[64] *See* 46 CFR § 108.525(a); 46 C.F.R. § 109.301.
[65] *See Graham*, 210 F.3d at 343.

13

"direct and substantial link" between a contract and the operation of a ship is required for a vessel to have a "substantial role" in the operations being performed on a platform.[66] There, the Fifth Circuit explained that a vessel's crew transportation function, even when combined with other auxiliary functions, was not sufficient to show that the vessel had a substantial role in the operations on the platform even though it was "necessary" to the platform work.[67]

Palfinger argues that its services only facilitated a transportation function—transporting workers away from the Auger platform in case of an emergency—that would not be sufficient to establish a direct and substantial link between a contract and the operation of a ship, and therefore cannot establish a close nexus between Palfinger's services and the wells on the Auger platform. The Court disagrees. In *Genesis*, the Fifth Circuit did not analyze or apply Texas law, let alone the requirements for a contract to "pertain to a well" under the TOAIA. *Genesis* addressed whether a contract contemplated the substantial use of vessels such that it was maritime in nature—an analysis involving an entirely separate standard. Even if the reasoning in *Genesis* were instructive here, the facts of this case are distinguishable. Here, the lifeboats served not only a transportation function, but also a safety function that was 1) necessary for the protection of workers exploring for oil and gas on the Auger platform and 2) required by the Coast Guard for production on the Auger to continue. Thus, this safety function weighs in favor of a close nexus between Palfinger's services and the wells on the Auger platform.

Second, services performed on platforms supporting multiple wells are more likely to have a close nexus to the wells themselves. Texas intermediate appellate courts have held that services must have some physical proximity to a well for there to be a close nexus to production activities. In *Transworld Drilling*, a Texas intermediate court found that the TOAIA did not apply to an

---

[66] *Genesis Energy, L.P. v. Danos, L.L.C.*, 152 F.4th 648, 652 (5th Cir. 2025).
[67] *Id.* at 654, 657.

agreement to repair an offshore drilling rig when the contractor performed the repairs in a shipyard.[68] The court rejected the contractor's argument that it was rendering services in connection with a "structure intended for use in the exploration for or production of a mineral" because the Legislature did not intend to cover an on-shore repair contract that had no connection with the drilling of an actual well.[69] Similarly, in *Singleton*, another Texas intermediate appellate court held that the TOAIA did not apply to an agreement between a petroleum company and its contractor because it required the contractor to perform work inside the company's plant.[70]

The Fifth Circuit, however, explained that it is not a requirement for services to be performed on the well itself—the activities specifically listed as "well or mine services" under the TOAIA are "typically performed in close proximity to a well, but not all of them are directed at the wellbore itself."[71] While at least some of the work performed by the contractor in *Graham* was performed on the actual wellheads located on the satellite platform,[72] the modification of the safety shutdown system occurred on the "A platform," not the actual wells that the platform supported.[73] It was this work to the safety shutdown system that "satisfie[d] the requisite connection to a well."[74] The Fifth Circuit further suggested that services performed on platforms supporting multiple wells have a close nexus to the wells:

> Our treatment of the multiple wells on the platforms as one 'well' under the TOAIA reinforces our decision, because we view these platforms as integral to the drilling and production operations. [The contractor's] services, involving work on the platforms themselves, are directly supportive of the wells.[75]

---

[68] *Transworld Drilling*, 693 S.W.2d at 23.
[69] *Id.*
[70] *Singleton*, 713 S.W.2d at 121.
[71] *Graham*, 210 F.3d at 343.
[72] *Id.* ("[T]he agreement called for Dynamic to fabricate and install a manifold on the satellite platform and tie in flowlines to the actual wellheads located on that platform.").
[73] *Graham*, 210 F.3d at 336-37.
[74] *Id.* at 343.
[75] *Id.*

The court in *Dennis* also found that the catch-all provision of "otherwise rendering services in connection with a mine shaft, drift, or other structure intended for use in exploring for or producing a mineral" included in subsection (4)(A)(ii) "must reasonably be read to include all activities pertaining to covered structures, including activities related to removal of the structures after the completion of exploration and/or production."[76] The court therefore held that dismantling and removal of a production platform qualified as "well or mine services."[77] While the court in *Catlin* criticized *Dennis* for characterizing *Graham*'s "close nexus" requirement as dicta, the court did not challenge *Dennis*'s holding.[78] In sum, *Graham* and *Dennis* suggest that services rendered in connection with a platform supporting multiple wells have a close nexus to those wells.

Here, Palfinger's services did not occur at an on-shore shipyard or plant, but rather concerned the components of a platform supporting production from approximately eighteen oil and gas wells. Because platforms supporting multiple wells are "integral to the drilling and production operations,"[79] and because services "involving work on the platforms themselves are directly supportive of the wells,"[80] Palfinger's work concerning the components of an oil and gas platform had a close nexus to the wells.

Palfinger, however, argues that its services did not have a close nexus to the wells because there was no physical or functional connection or relation to well activities. The Court disagrees. First, Palfinger's services on the Auger platform were in close proximity to the wells such that a close nexus can be found. Second, while Palfinger's services did not affect the functionality of the

---

[76] *Dennis*, 823 F.Supp.2d at 419.

[77] *Id.*

[78] The contract at issue in *Catlin* concerned the supply and transportation of materials for the construction of "well pad sites and . . . private roads," and did not concern "a mine shaft, drift, or other structure intended for use in exploring for or producing a mineral" or otherwise implicate subsection (4)(A)(ii). *Catlin*, 2016 WL 4276131, at *6-7.

[79] *See Graham*, 210 F.3d at 343.

[80] *Id.*

16

wellheads themselves,[81] the services nevertheless satisfy the requisite connection to a well because Palfinger performed the services directly to the Auger platform, the services served a necessary safety function, and the services were directed toward maintaining production from the wells. Palfinger did more than simply deliver or transport materials to be used in the production process[82]—it provided services *to the Auger platform* that were required by the Coast Guard for oil and gas production on the Auger to continue. Because the Fifth Circuit explained that services concerning platforms are "directly supportive of the wells,"[83] and because Palfinger's services were required by the Coast Guard to maintain the safety of employees manning the production facility, the Court finds that a close nexus is present.

Accordingly, the Court grants Shell's motion for summary judgment and denies Palfinger's motion for summary judgment.

## IV.
### CONCLUSION

For the reasons set forth above, Palfinger's and ZAIC's motion [ECF No. 202] is DENIED and Shell's motion [ECF No. 207] is GRANTED.

THUS DONE in Chambers on this ___19th___ day of March, 2026.

ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE

---

[81] The Court notes that the modifications to the safety shutdown system in *Graham* did affect how the wellheads operated. *Graham*, 210 F.3d at 336-37. The modifications "allowed the operator to segregate the product from each individual well for testing and enabled the operator to shut in any particular well in case of an emergency." *Id*. However, the Fifth Circuit did not specifically find that there must be a functional relation between the services and the wells for there to be a close nexus.

[82] *Cf. Catlin*, 2016 WL 4276131, at *7 (finding that a contract requiring a construction company to purchase and deliver aggregate for the construction of private roads and well pad sites did not fall under the TOAIA); *Coastal Transport*, 20 S.W.3d at 128 (finding that the TOAIA did not apply to a terminal loading agreement that involved refining, supplying, and transporting petroleum products).

[83] *Graham*, 210 F.3d at 343.